UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05-10327-RCL

ONEBEACON AMERICA INSURANCE COMPANY
         Plaintiff,

vs.

EASTERN YACHT SALES, INC.,
EASTERN YACHT SALES OF RHODE ISLAND, Inc.,
ROBERT L. LUSSIER, and
RONALD LUSSIER
         Defendants.

### AFFIDAVIT OF ROBERT E. COLLINS

I, Robert E. Collins, upon oath, do depose and state as follows:

1.    I am an attorney in good standings and am a member of the Bar of the Commonwealth of Massachusets of the United States District Court for the District of Massachusetts and the United States Court of Appeals for the First Circuit.  I am counsel for plaintiff, OneBeacon America Insurance Company, in the above captioned action.

2.    I affix herewith a true copy of the following exhibits submitted in support of Plaintiff's Motion for Summary Judgment:

    1.    Copy of Plaintiff's Complaint;
    2.    Copy of Answer of Eastern Yacht Sales, Inc. and Eastern Yacht Sales of Rhode Island, Inc.
    3.    Copy of pages from the deposition of Robert L. Lussier;
    4.    Copy of pages from the deposition of Ronald Lussier, Volume I;
    5.    Copy of the Bill of Sale from Eastern Yacht Sales of Rhode Island to Robert L. Lussier and Ronald

2

Lussier for the      2003 Jeannu 45.2;

6.   Invoice from Jeannu America, Inc. to Eastern
     Yacht Sales dated August 8, 2002;

7.   Invoice for Bob Lussier dated April 14, 2003;

8.   Copy of Check No. 311 dated June 30, 2003 in
     amount of $308,041.00;

9.   Copy of the Delivery and Relief Certificate dated
     August 18, 2003;

10.  Copy of Plaintiff's Third Amended Complaint and
     Jury Claim in C.A. No: 04-CV-11071 RCL;

11.  Copy of pages from deposition of Ronald Lussier,
     Volume II;

12.  Copy of the Insurance Policy issued by OneBeacon
     America Insurance to Eastern Yacht Sales, Inc.,
     et al;

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS

14TH DAY OF APRIL, 2006.


                              _"/s/Robert E. Collins"
                              Robert E. Collins

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.

ONEBEACON AMERICA INSURANCE COMPANY
         Plaintiff,

vs.

EASTERN YACHT SALES, INC.,
EASTERN YACHT SALES OF RHODE ISLAND, Inc.,
ROBERT L. LUSSIER, and
RONALD LUSSIER
         Defendants.

## PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. §2201, et. seq. and F.R.CIV.P.57

Now comes the plaintiff, OneBeacon America Insurance Company, in the above entitled action, by and through its undersigned counsel, Clinton & Muzyka, P.C., and files this Complaint for Declaratory Judgment and states as follows:

### JURISDICTION

1.    This action is an action brought pursuant to the Court's admiralty jurisdiction, 28 U.S.C. §1333, and is a matter within the meaning of Rule 9(h), F.R.Civ.P.

### VENUE

2.    Venue is properly established in this Court pursuant to 28 U.S.C. §1391(b), in that the Defendant, Eastern Yacht Sales, Inc. is a Delaware corporation with its principal place of business in Hingham, Massachusetts; the Defendant,

2

Eastern Yacht Sales of Rhode Island, Inc. is a Delaware corporation with its principal place of business in Portsmouth, Rhode Island; the Defendant Robert Lussier is, upon information and belief, a resident of Bellingham, Massachusetts; and the Defendant Ronald Lussier is, upon information and belief, a resident of Sausalito, California.

## THE PARTIES

3.    The plaintiff, OneBeacon America Insurance Company (hereinafter referred to as "OneBeacon"), is a Massachusetts insurance corporation with a principal place of business at One Beacon Street, Boston, Massachusetts.

4.    The defendant, Eastern Yacht Sales, Inc. (hereinafter referred to as "Eastern"), is a Delaware corporation with a principal place of business at 335 Lincoln Street, Hingham, Massachusetts.

5.    The defendant, Eastern Yacht Sales of Rhode Island, Inc. (hereinafter referred to as "Eastern R.I."), is a Delaware corporation with a principal place of business at 39 Alexander Road, Portsmouth, Rhode Island.

6.    The defendant, Robert L. Lussier, upon information and belief, is a resident of 33 Trenton Street, Bellingham, Massachusetts.

3

7.    The defendant, Ronald Lussier, upon information and belief, is a resident of 67 Cresent Avenue, Sausalito, California and is subject to the jurisdiction of this Honorable Court.

## CLAIM FOR RELIEF

8.    This is an action brought pursuant to 28 U.S.C. §2201, et. seq., and Rule 57, F.R.Civ.P., in which OneBeacon seeks a declaration that it has no duty to defend and/or indemnify Eastern or Eastern R.I. under certain marine insurance policy overages issued by OneBeacon to Eastern and Eastern R.I. in connection with claims brought by defendants, Robert L. Lussier and Ronald Lussier, as described below.

## COUNT I

9.    OneBeacon reaffirms and realleges its allegations contained in Paragraphs 1 through 8 inclusive and above, with the same force and effect as if more fully set forth herein.

10.    OneBeacon issued by renewal to Eastern and Eastern R.I. on May 1, 2003 a policy of marine insurance, No. C5JH20189, for a term from May 23, 2003 to May 23, 2004, containing a separate and independent overage for Marine Operators Legal liability (MOLL). A copy of the policy is attached hereto as Exhibit "A".

4

11.   Defendants, Robert L. Lussier and Ronald Lussier, have instituted a civil action against Eastern, et. al., for property damage loss to the S/V PHOENIX arising out of and resulting from a fire on December 4, 2003.

12.   Said civil action is currently pending in the United States District Court for the District of Massachusetts, Civil Action No. 04-CV-11071-RCL.  A copy of the Second Amended Complaint is attached hereto as Exhibit "B".

13.   Eastern has demanded that OneBeacon defend and indemnify it in connection with the said civil action.

14.   Pursuant to the terms and conditions of the aforesaid policy of marine insurance, OneBeacon is not obligated to defend or indemnify Eastern or Eastern R.I. in the said action.

**WHEREFORE**, Plaintiff, OneBeacon America Insurance Company, prays for a judgment declaring that OneBeacon is not obligated to defend and/or indemnify Eastern or Eastern R.I. under the Marine Operators Legal liability (MOLL) coverage with respect to any and all claims in the civil suit commenced by Robert L. Lussier and Ronald Lussier, and for such other and further relief as this Honorable Court deems just and proper.

5

## COUNT II

15.  OneBeacon reaffirms and realleges its allegations

contained in Paragraphs 1 through 8 inclusive and above,

with the same force and effect as if more fully set forth

herein.

16.  OneBeacon issued by renewal to Eastern and Eastern R.I.

on May 1, 2003 a policy of marine insurance, No. C5JH20189,

for a term from May 23, 2003 to May 23, 2004, containing a

separate and independent overage for Protection and

Indemnity.  *See Exhibit "A"*.

17.  Defendants, Robert L. Lussier and Ronald Lussier, have

instituted a civil action against Eastern, et. al., for

property damage loss to the S/V PHOENIX arising out of and

resulting from a fire on December 4, 2003.

18.  Said civil action is currently pending in the United

States District Court for the District of Massachusetts,

Civil Action No. 04-CV-11071-RCL.  *See Exhibit "B"*.

19.  Eastern has demanded that OneBeacon defend and

indemnify it in connection with the said civil action.

20.  Pursuant to the terms and conditions of the aforesaid

policy of marine insurance, OneBeacon is not obligated to

6

defend or indemnify Eastern or Eastern R.I. in the said action.

**WHEREFORE**, Plaintiff, OneBeacon America Insurance Company, prays for a judgment declaring that OneBeacon is not obligated to defend and/or indemnify Eastern or Eastern R.I. under the Protection and Indemnity coverage with respect to any and all claims in the civil suit commenced by Robert L. Lussier and Ronald Lussier, and for such other and further relief as this Honorable Court deems just and proper.

### COUNT III

21.   OneBeacon reaffirms and realleges its allegations contained in Paragraphs 1 through 8 inclusive and above, with the same force and effect as if more fully set forth herein.

22.   OneBeacon issued by renewal to Eastern and Eastern R.I. on May 1, 2003 a policy of marine insurance, No. C5JH20189, for a term from May 23, 2003 to May 23, 2004, containing a separate and independent overage for Commercial General Liability. *See Exhibit "A"*.

23.   Defendants, Robert L. Lussier and Ronald Lussier, have instituted a civil action against Eastern, et. al., for

7

property damage loss to the S/V PHOENIX arising out of and resulting from a fire on December 4, 2003.

24.    Said civil action is currently pending in the United States District Court for the District of Massachusetts, Civil Action No. 04-CV-11071-RCL.  *See Exhibit "B"*.

25.    Eastern has demanded that OneBeacon defend and indemnify it in connection with the said civil action.

26.    Pursuant to the terms and conditions of the aforesaid policy of marine insurance, OneBeacon is not obligated to defend or indemnify Eastern or Eastern R.I. in the said action.

   **WHEREFORE**, Plaintiff, OneBeacon America Insurance Company, prays for a judgment declaring that OneBeacon is not obligated to defend and/or indemnify Eastern or Eastern R.I. under the Commercial General Liability coverage with respect to any and all claims in the civil suit commenced by Robert L. Lussier and Ronald Lussier, and for such other and further relief as this Honorable Court deems just and proper.

### COUNT IV

27.    OneBeacon reaffirms and realleges its allegations contained in Paragraphs 1 through 8 inclusive and above,

8

with the same force and effect as if more fully set forth herein.

28.   OneBeacon issued by renewal to Eastern and Eastern R.I. on May 1, 2003 a policy of marine insurance, No. C5JE20189, for a term from May 23, 2003 to May 23, 2004, containing a separate and independent overage for Boat Dealer's Insurance.   *See Exhibit* "A".

29.   Defendants, Robert L. Lussier and Ronald Lussier, have instituted a civil action against Eastern, et. al., for property damage loss to the S/V PHOENIX arising out of and resulting from a fire on December 4, 2003.

30.   Said civil action is currently pending in the United States District Court for the District of Massachusetts, Civil Action No. 04-CV-11071-RCL.   *See Exhibit* "B".

31.   Eastern has demanded that OneBeacon defend and indemnify it in connection with the said civil action.

32.   Pursuant to the terms and conditions of the aforesaid policy of marine insurance, OneBeacon is not obligated to defend or indemnify Eastern or Eastern R.I. in the said action.

**WHEREFORE**, Plaintiff, OneBeacon America Insurance Company, prays for a judgment declaring that OneBeacon is not obligated to defend and/or indemnify Eastern or Eastern

9

R.I. under Boat Dealer's Insurance coverage with respect to any and all claims in the civil suit commenced by Robert L. Lussier and Ronald Lussier, and for such other and further relief as this Honorable Court deems just and proper.

DATED at Boston, Massachusetts, this 17th day of February 2005.

By its attorneys,

**CLINTON & MUZYKA, P.C.**

**Thomas J. Muzyka**
**BBO NO. 365540**
**Robert E. Collins**
**BBO NO. 555843**
One Washington Mall
Suite 1400
Boston, MA 02108
(617)723-9165

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10327-RCL

ONEBEACON AMERICA INSURANCE COMPANY
　　　　　Plaintiff,

v.

EASTERN YACHT SALES, INC.,
EASTERN YACHT SALES OF RHODE ISLAND, INC.,
ROBERT L LUSSIER, and
RONALD LUSSIER,
　　　　　Defendants.

**DEFENDANTS, EASTERN YACHT SALES, INC. AND
EASTERN YACHT SALES OF RHODE ISLAND, INC.'S
ANSWER AND COUNTERCLAIM**

NOW COME the Defendants, Eastern Yacht Sales, Inc. and Eastern Yacht Sales of

Rhode Island, Inc., and set forth their Answer and Counterclaim to the Plaintiff's Complaint as

follows:

**ANSWER**

1.　　Admitted.

2.　　Admitted.

3.　　Admitted.

4.　　Admitted.

5.　　Admitted.

6.　　Admitted.

7.　　Admitted.

8.　　This paragraph of the Complaint is introductory and does not require a response.

## COUNT I

9.      Defendant repeats and re-alleges each and every statement as forth above as if fully restated herein.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    Admitted.

14.    Denied.

## COUNT II

15.    Defendant repeats and re-alleges each and every statement as forth above as if fully restated herein.

16.    Admitted.

17.    Admitted.

18.    Admitted.

19.    Admitted.

20.    Denied.

## COUNT III

21.    Defendant repeats and re-alleges each and every statement as forth above as if fully restated herein.

22.    Admitted.

23.    Admitted.

24.    Admitted.

25.    Admitted.

2

26.    Denied.

## COUNT IV

27.    Defendant repeats and re-alleges each and every statement as forth above as if fully restated herein.

28.    Admitted.

29.    Admitted.

30.    Admitted.

31.    Admitted.

32.    Denied.

## COUNTERCLAIM

NOW COME the Defendants/Plaintiffs-in-Counterclaim, Easter Yacht Sales, Inc. and Eastern Yacht Sales of Rhode Island, Inc. (hereinafter collectively referred to as "Eastern Yacht Sales"), and by way of answering in counterclaim state as follows:

### COUNT I
### (Violation of M.G.L. Chapter 93A)

1.    This action is brought pursuant to M.G.L. Chapter 93A.

2.    The Plaintiffs-in-Counterclaim, Easter Yacht Sales, Inc. and Eastern Yacht Sales of Rhode Island, Inc., are both Delaware corporations doing business in Massachusetts and Rhode Island, respectively.

3.    The Defendant-in-Counterclaim, OneBeacon America Insurance Company ("OneBeacon"), is a Massachusetts insurance corporation with a place of business at One Beacon Street, Boston, Massachusetts.

4.    Easter Yacht Sales purchased a policy of marine insurance No. C5JH20189, for a term from May 23, 2003 to May 23, 2004, ("the Policy") which contained separate and

3

independent coverage for Marine Operators Legal Liability, for Protection and Indemnity Commercial General Liability and for Boat Dealers Insurance.

5.    Pursuant to the terms of the Policy, OneBeacon is obligated to defend and indemnify Eastern Yacht Sales for claims arising from property damage/loss to the S/V Phoenix as a result of a fire on December 4, 2004 (hereinafter the "Claims").

6.    Pursuant to the terms of the Policy, Eastern Yacht Sales demanded that OneBeacon defend and indemnify Eastern Yacht Sales with respect to any and all Claims in Civil Action No. 04-CV-11071-RCL ("the Civil Action").

7.    OneBeacon has engaged in an unfair trade practice by refusing to defend or indemnify Eastern Yacht Sales in the Civil Action pursuant to the terms of the Policy.

8.    On or about February 25, 2005, Eastern Yacht Sales delivered a demand letter ("the demand letter") to OneBeacon pursuant to M.G.L. Chapter 93A (a copy of which is attached hereto as Exhibit "A"), citing OneBeacon's failure to defend and indemnify Eastern Yacht Sales in the Civil Action as an unfair trade practice in violation of the Massachusetts Consumer Protection Statute, M.G.L. Chapter 93A.

9.    OneBeacon failed to respond to the demand letter and continues to refuse to defend or indemnify Eastern Yacht Sales in the Civil Action.

WHEREFORE, Eastern Yacht Sales prays for a judgment against OneBeacon for multiple damages, costs, expenses and attorneys' fees and further relief as this Honorable Court deems just and proper.

4

COUNT II
(Bad Faith)

10.    Eastern Yacht Sales reaffirms and re-alleges its allegations contained in

paragraphs 1 through 9 inclusive and above with the same force and effect as if more fully set

forth herein.

11.    The failure of OneBeacon to defend and/or indemnify Eastern Yacht Sales in the

Civil Action pursuant to the terms of the Policy constitutes bad faith.

WHEREFORE, Eastern Yacht Sales prays for a judgment against OneBeacon for

damages, costs and expenses incurred by Eastern Yacht Sales as a result of OneBeacon's

wrongful conduct and further relief as this Honorable Court deems just and proper.

Defendants reserve the right to amend or supplement this Answer and Counterclaim at

any time prior to trial.

**JURY DEMAND**

**DEFENDANTS/PLAINTIFFS-IN-COUNTERCLAIM DEMAND A
TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Defendants,
Eastern Yacht Sales, Inc. and
Eastern Yacht Sales of Rhode Island, Inc.,
By their attorney,


/s/
WILLIAM B. GOLDEN, ESQ.
BBO # 198460
Baker, Braverman & Barbadoro, P.C.
50 Braintree Hill Park, Suite 108
Braintree, MA 02184
(781) 848-9610

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of Defendants, Eastern Yacht Sales, Inc. and Eastern

Yacht Sales of Rhode Island, Inc.'s, Answer and Counterclaim was served upon counsel of

record for the parties at the following addresses in the following manner this 13th day of June

2005.

OneBeacon America Insurance Company:
**Electronically through the U.S.D.C. ECF filing:**

Robert E. Collins, Esq.
Thomas J. Muzyka, Esq.
Clinton & Muzyka
One Washington Mall, Suite 1400
Boston, MA  02108

Robert L. Lussier & Ronald Lussier:
**By First Class Mail:**

Robert G. Cohen, Esq.
Law Offices of Robert G. Cohen
188 Oaks Road
Framingham, MA  01702

/s/
_____
WILLIAM B. GOLDEN, ESQ.
BBO # 198460
Baker, Braverman & Barbadoro, P.C.
50 Braintree Hill Park, Suite 108
Braintree, MA  02184
(781) 848-9610

6

1

COPY                          Volume: I

                              Pages: 1-122

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

ROBERT L. LUSSIER, ET AL.,

            Plaintiffs,

    v.

EASTERN YACHT SALES, INC.,

JEANNEAU AMERICA, INC., and

CHANTIERS JEANNEAU,

            Defendants.

- - - - - - - - - - - - - - - - x

        DEPOSITION of ROBERT L. LUSSIER, a

witness called by counsel for Jeanneau America,

Inc., taken pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Toni F. Beckwith, Registered

Merit Reporter, CSR No. 111293 and Notary Public

in and for the Commonwealth of Massachusetts, at

the Offices of Clarkin, Sawyer & Phillips, PC,

20 William Street, Wellesley, Massachusetts, on

Tuesday, September 6, 2005, commencing at 10:45

a.m.

```
1        APPEARANCES:

2

3            ROBERT G. COHEN, ESQUIRE

4            188 Oaks Road

5            Framingham, Massachusetts 01702

6            Counsel for the Plaintiffs

7

8            BAKER BRAVERMAN & BARBADORO PC

9            By William B. Golden, Esquire

10           50 Braintree Hill Park

11           Braintree, Massachusetts 02184

12           Counsel for Eastern Yacht Sales

13

14           FLANAGAN & HUNTER, P.C.

15           By Brian P. Flanagan, Esquire

16           88 Black Falcon Avenue, Suite 274

17           Boston, Massachusetts 02210

18           Counsel for Jeanneau America, Inc.

19

20           HODOSH SPINELLA & ANGELONE PC

21           By Thomas C. Angelone, Esquire

22           One Turks Head Place, Suite 1050

23           Providence, Rhode Island 02903

24           Counsel for Chantiers Jeanneau
```

1          CLINTON & MUZYKA

2          By Robert Collins, Esquire

3          One Washington Mall

4          Boston, Massachusetts 02108

5          Counsel for OneBeacon Insurance

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

5

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | MR. COHEN:  I presume you'll want the |
| 3 | usual stipulations? |
| 4 | MR. FLANAGAN:  Yes.  What about |
| 5 | signing? |
| 6 | MR. COHEN:  We'll have him read it and |
| 7 | sign it within 30 days under the penalties of |
| 8 | perjury.  Waive the notary, please. |
| 9 | You just have to answer the questions, |
| 10 | okay? |
| 11 | THE WITNESS:  Okay. |
| 12 | MR. COHEN:  You have to keep your |
| 13 | voice up for hearing issues. |
| 14 | THE WITNESS:  Or I'll be looking at |
| 15 | you. |
| 16 | ROBERT L. LUSSIER, |
| 17 | having been satisfactorily identified by the |
| 18 | production of his driver's license, and duly |
| 19 | sworn by the Notary Public, was examined and |
| 20 | testified as follows: |
| 21 | |
| 22 | DIRECT EXAMINATION |
| 23 | BY MR. FLANAGAN: |
| 24 | Q.  Would you state your full name, |

6

1    please.

2           A.   Robert Leo Lussier.

3           Q.   Your current address?

4           A.   33 Trenton Street, Bellingham,

5    Massachusetts.

6           Q.   How long have you lived at that

7    address?

8           A.   I've lived at that address two years.

9           Q.   Is it a single-family dwelling?

10          A.   No.   It's a three-family.   It's an

11   apartment.

12          Q.   Do you own the property?

13          A.   I do now.

14          Q.   What is your present work status?

15          A.   I'm retired.

16          Q.   What was your occupation before you

17   retired?

18          A.   Carpenter.

19          Q.   Where was that located?   Was that in

20   the same --

21          A.   Bellingham, that area.

22          Q.   What is your date of birth?

23          A.   11/7/39.

24          Q.   Do you know your Social Security

DUNN & GOUDREAU COURT REPORTING
617 742-6900

1    a 30-foot powerboat.  And we had that until she

2    died.  Then I kept it for another two years, and

3    then I sold that one.  And I bought another

4    sailboat, and that was in 1980.  Wait a minute.

5              (Pause)

6         A.   I can't remember the date I bought

7    that other sailboat, but I bought another

8    sailboat.

9         Q.   Was it sometime in the 1980s?

10        A.   Yeah.

11        Q.   How big was the other sailboat?

12        A.   30-footer.

13        Q.   Did that sailboat have an engine?

14        A.   Yes, an inboard.

15        Q.   Diesel or gas?

16        A.   Diesel.  As far as I can remember, I

17   had that one until I bought this new boat.  I

18   traded that bought in, the Catalina.

19        Q.   You traded the Catalina in?

20        A.   Yes.

21        Q.   For the Jeanneau?

22        A.   The Jeanneau.

23        Q.   All these boats you just discussed,

24   did you own them individually, or did you own

12

1    them jointly with other people?

2        A.   Individually.

3        Q.   When did you first look at the

4    Phoenix?

5        A.   I looked at the Phoenix -- actually, I

6    was in California at the time, and I thought

7    about buying a boat.  And when I came home --

8    actually, I was going to look at the Catalina,

9    and the salesman kind of moved me over to the

10   Phoenix.  But I don't remember the date.

11       Q.   You said you were in California.  Were

12   you visiting in California or was --

13       A.   I was visiting my son in California,

14   and I don't know, I just got the idea to get

15   another boat.

16       Q.   Had you retired by that time?

17       A.   Yes.  Yes.

18       Q.   What year did you retire?

19       A.   I retired in -- I was 60 years old

20   actually, and I'm 65 now, so...

21       Q.   1999?

22       A.   Somewhere around there.

23       Q.   You mentioned a salesman that you

24   talked to initially regarding a Catalina?

13

1        A.   Yes.

2        Q.   Who was the salesperson?

3        A.   The salesperson at Eastern Yacht

4   Sales.  I think it was Will Collins.  I'm not

5   sure about that, though.

6        Q.   How did you happen to approach Eastern

7   Yacht Sales?

8        A.   I think I saw an ad in the paper, and

9   I went down there looking around.

10       Q.   Was Mr. Collins the only person at

11   Eastern Yacht Sales that you had dealings with?

12       A.   He was the only salesman I had

13   dealings with, yeah.

14       Q.   Where was Eastern Yacht Sales located

15   when you met with Mr. Collins?

16       A.   In Rhode Island.  I can't remember the

17   name of the town right now.

18       Q.   Portsmouth?

19       A.   That sounds right.

20       Q.   Who else at Eastern Yacht Sales did

21   you have dealings with?

22       A.   I talked to his boss, and I talked to

23   different mechanics in the setup of the boat.

24       Q.   Who was Mr. Collins's boss?

14

1          A.   I can't remember.  I'm sorry.

2          Q.   Can you put a time frame on when you

3     first began dealing with Eastern Yacht Sales?

4          A.   I think it was in the spring of '88.

5     I'm sorry, I can't.

6          Q.   Do you recall when you finally

7     purchased the Phoenix?

8          A.   I don't have that information on me.

9     Sorry.  I want to help, I just don't...

10          MR. COHEN:  We have records available

11     to us.  I have a complete file with me.

12          Q.   Where was the Phoenix when you first

13     saw it?

14          A.   It was at Eastern Yacht Sales.  It was

15     out of the water.  It was right next to the

16     Catalina.

17          Q.   What was explained to you about the

18     vessel at the time?

19          A.   He just said if you're interested in

20     the Catalina, I can give you a good deal on

21     this, and he just told me, like, it was a nicer

22     boat.  When I looked at it, I agreed.  I fell in

23     love with the boat.

24          Q.   Did you demo the boat before you

15

1    purchased it?

2         A.   No.   It was out of the water.

3         Q.   Did you demo the Catalina?

4         A.   No.   I've had Catalinas, though.   I

5    know Catalinas.

6         Q.   How big a vessel was the Catalina that

7    you were first looking at?

8         A.   I believe it was a 47.

9         Q.   What led you to purchase this vessel

10   instead of the Catalina?

11        A.   I just fell in love with the vessel.

12        Q.   Do you recall what the initial

13   purchase price for the vessel was?

14        A.   Exact purchase price, I don't know,

15   but it was around 350.

16        Q.   Do you recall what your final purchase

17   price of the vessel was?

18        A.   No.

19        Q.   In conjunction with the purchase of

20   the vessel, did you request that work be

21   conducted on the vessel?

22        A.   Yes.

23        Q.   What work did you request be conducted

24   on the vessel?

16

1       A.   Well, we went -- the agent and I went

2    through everything that I wanted on the vessel

3    as far as radios and everything to get it ready

4    for the ocean.

5       Q.   Do you recall what some of those items

6    were?

7       A.   The radios, water maker.

8       Q.   Water maker?

9       A.   Yes, desalinator, water maker, heating

10    system.

11            MR. COLLINS:   Heating?

12            THE WITNESS:   Yes.

13       Q.   Any particular reason why you needed a

14    heating system on the vessel?

15       A.   No reason.   It seemed like a good

16    idea.

17       Q.   Did the vessel come with air

18    conditioning?

19       A.   No.

20       Q.   Did the heating system include air

21    conditioning?

22       A.   No.

23       Q.   Can you tell me, did you plan to live

24    aboard the vessel?

1          A.   I did.

2          Q.   Where were you living at the time you

3     purchased the vessel?

4          A.   In my apartment.

5          Q.   The same apartment that you mentioned

6     a while ago?

7          A.   That's why I took the apartment.   I

8     sold the house that I had.

9          Q.   Did you add any navigational equipment

10     to the vessel?

11          A.   Yes.

12          Q.   Do you recall what that was?

13          A.   We had -- what is it?   There's a GPS

14     that came with it, the boat.   Then I also had

15     them add another one.

16          Q.   Anything else?

17          A.   That's really all I can think of right

18     now.

19          Q.   So these are all items that you

20     requested to be added to the existing boat?

21          A.   It was all part of the original

22     contract.

23          Q.   And do you recall what the cost of

24     these additional items were?

18

1          A.   The cost? No, I don't.

2          Q.   Is there a record that would include

3     what the additional costs were?

4          A.   Yes.  It's all in the purchase price.

5          Q.   The other plaintiff in this matter is

6     your son?

7          A.   Yes.

8          Q.   How do you pronounce his name?

9          A.   Ronald.

10         Q.   Is it Ronald?

11         A.   Yes.  I think he kind of changed it.

12     It's just Ron.

13         Q.   Was your son present when you

14     negotiated the purchase of the boat?

15         A.   Not when I negotiated the purchase of

16     the boat, no.

17         Q.   Is there any particular reason that

18     your son is named as a co-owner of the boat?

19         A.   He gave me a little bit of money to

20     help me, so I just made him part owner.

21         Q.   How much money did he give you?

22         A.   I think it's around 60, $70,000.

23         Q.   Did you seek a loan from any other

24     individual or company in order to purchase the

1    boat?

2         A.   No.

3         Q.   Where did you come up with the funds

4    for the purchase of the vessel?

5         A.   I had just sold my house.

6         Q.   Does your son Ron have any sort of a

7    security interest or ship mortgage on the boat?

8         A.   No.  He's a mutual owner.

9         Q.   Does anybody else have any sort of

10   security interest or --

11        A.   No.

12        Q.   -- lien on the boat?

13        A.   No, none at all.

14        Q.   When did you take delivery of the

15   vessel?

16        A.   That's a hard question to answer

17   because they gave me the boat and then they took

18   it back.  I think it was August.

19        Q.   You indicated they gave you the boat

20   and then they took it back.  Does "they" mean

21   Eastern Yacht Sales?

22        A.   There were a lot of problems with the

23   boat.  Eastern Yacht Sales, right.

24        Q.   What sort of problems -- so this is

20

1    when you first picked up the boat.  You said you

2    had a lot of problems with it?

3         A.   Mm-hmm.

4         Q.   Can you tell me what those problems

5    entailed?

6         A.   Some of them were minor, and others

7    weren't.

8         Q.   Let's start with the major ones first.

9         A.   I can't remember.

10        Q.   Were there any problems with the

11   engine prior to the event we're talking about

12   here at this deposition?

13       -- A.   No.   No.

14        Q.   Were there any problems with the

15   vessel's mechanical systems, other than the

16   engine?

17          A.   Not that I can remember.

18          Q.   Were there any problems with leaks in

19   the vessel?

20         A.   No.   That wasn't a problem.   I

21   remember one that just came to me is they had

22   installed -- there's two things underneath the

23   boat that grounded -- some kind of a radio, but

24   I can't remember what the name of it is, but

21

1   they grounded the radio.  And come to find out

2   when they put the boat in the water, it ground

3   out of the water, so they had to redo it and put

4   them down lower.

5       Q.  Let me just go back on that one for a

6   moment, sir.  Were these, for example, were

7   these zincs or something?

8       A.  Well, no.  It's like a ground.  It was

9   for one of the radios.  I believe it was for the

10  main radio.  I can't think of it right now.  It

11  had to be grounded.  And when they put the boat

12  in the water, the grounds were out of the water

13  and it wouldn't work, so they had to redo it.

14      One of the things I had trouble with

15  the boat is that I just thought of that I can

16  tell you is I had also taken the boat on a small

17  trip to that island off of Rhode Island.

18      MR. COLLINS:  Block?

19      Q.  Block Island?

20      A.  Thank you.  Halfway there I stopped in

21  a place in -- no.  I'm sorry.  It wasn't on that

22  trip.  It was on the main trip that that

23  happened when I had left to go south.  My son

24  was with me at the time, and we stopped in

29

1          A.    When we went to Maine, we called, and

2     they got us in touch with a water maker company.

3     And they tried different things, and it just

4     wouldn't work.    Then when we got back, they

5     tried different things that wouldn't work.

6               Finally they determined there was some

7     motor with a magnetic drive that was wrong, and

8     they were going to send me a motor, a new motor.

9     And I got the motor after the fire.

10         Q.    When you finally took delivery of the

11    boat for the first time, did you take it out and

12    go through sea trials?

13         A.    Yes.

14         Q.    And did anybody accompany you on those

15    sea trials?

16         A.    Yes.

17         Q.    Who?

18         A.    Eastern Yacht Sales.

19         Q.    Do you remember who from Eastern Yacht

20    Sales?

21         A.    That salesman and the major mechanic,

22    the head mechanic.

23         Q.    Did anybody from Cay Electronics

24    accompany you?

30

1        A.    Not that I remember, no.

2        Q.    Do you recall the name of the

3   mechanic?

4        A.    No, I don't.

5        Q.    Was the other person the salesman you

6   mentioned?

7        A.    The salesman, I believe, was Will

8   Collins.

9        Q.    For how long did the sea trials last?

10       A.    It wasn't very long.  It was maybe two

11  hours.

12       Q.    Where did they take place?

13       A.    In Narragansett Bay.

14       Q.    Did you find any problems aboard the

15  vessel during the sea trials?

16       A.    No.

17       Q.    After the sea trials, did you then

18  accept delivery and give Eastern Yacht Sales a

19  check?

20       A.    I did.  I don't know if it was that

21  day, but I did.

22       Q.    Up until the time you took delivery of

23  the vessel, did you have any dealings of any

24  sort with anybody representing Jeanneau America?

31

```
 1            A.   No.

 2            Q.   Did you have any dealings prior to

 3       delivery of the vessel with anybody relating

 4       Chantiers Jeanneau?

 5            A.   No.

 6            Q.   Was your son present during the sea

 7       trials?

 8            A.   No.

 9            Q.   Am I to understand correctly your son

10       resides in California?

11            A.   Yes.

12            Q.   After taking delivery, when did you

13       next take the vessel out on a voyage?

14            A.   There was something, I can't remember

15       exactly what it was now, but there was something

16       that came up right after we took delivery.  They

17       couldn't rectify it right away.  We stayed in

18       Portsmouth for two or three days, and then we

19       finally got underway.  So right about that time.

20            Q.   You said we.  Who do you mean by "we"?

21            A.   Well, there was four of us that went

22       on that.  There was my son, my brother and his

23       wife.

24            Q.   What is your brother's name?
```

32

```
 1          A.   Donald.

 2          Q.   And where does he reside?

 3          A.   In Bellingham.

 4          Q.   And his wife's name?

 5          A.   Paulette.

 6          Q.   And does she reside with him in

 7   Bellingham?

 8          A.   Yes.

 9          Q.   They were not, your son, your brother

10   and sister-in-law, were not present during the

11   sea trials?

12          A.   No.

13          Q.   And you had planned to take the boat

14   on a cruise?

15          A.   Yes.  We went to Bar Harbor.

16          Q.   And something occurred that kept you

17   in Portsmouth for a period of time?

18          A.   Yes.

19          Q.   Do you recall what that was?

20          A.   No.  But we were there two or three

21   days.

22          Q.   Was any sort of a work order generated

23   by Eastern Yacht Sales, to your knowledge?

24          A.   That I don't know.
```

33

1       Q.   But as you sit here today, do you have

2    a recollection of exactly what the problem or

3    problems were that kept you in Portsmouth?

4       A.   No, I don't.

5       Q.   After the problem was corrected, did

6    you take the boat to sea?

7       A.   We did.

8       Q.   Where did you go?

9       A.   Well, to start off, we just went down

10   a couple of miles to Newport, Rhode Island right

11   on the bay.  And something came up -- I don't

12   remember what it was -- but I remember something

13   came up, and we had to return.  So we went back,

14   and they took care of it.  And then we left

15   after that, and we went to Bar Harbor, Maine.

16       Q.   How long did it take to correct the

17   problem that occurred in Newport?

18       A.   It didn't take long.  I don't

19   remember, but it didn't take long.

20       Q.   At some time earlier you explained --

21       A.   I think that's when we started having

22   trouble with the water maker.

23       Q.   You earlier testified that at some

24   point you took delivery of the boat and then

34

1    they took the boat back from you and redelivered

2    it?

3         A.   When we came back from Bar Harbor,

4    Maine, they took the boat back from me because

5    it wasn't finished.   There were some things that

6    weren't finished.

7         Q.   So did you actually take formal

8    delivery before you went to Bar Harbor, or were

9    there exceptions to the delivered vessel?

10        A.   I think we took formal delivery.

11        Q.   Do you recall what items were

12   outstanding?

13        A.   No, I don't.  It wasn't so much items

14   as work that had to be done.

15        Q.   What sort of work was --

16        A.   I don't remember what it was.

17        Q.   Was some of it electrical?

18        A.   Some of the stuff that wasn't working

19   right or wasn't completed.

20        Q.   Do you have a recollection of what

21   wasn't working right, other than the water

22   maker?

23        A.   The water maker is one.  My mind goes

24   to the radio, but I'm not sure.

35

1          Q.   Did you have any problems with the --

2          A.   The boom bang was one of them that

3     they replaced.

4          Q.   Did you have any problems with the

5     engines or the engine?

6          A.   No.

7          Q.   Was there a generator on the vessel?

8          A.   Yes.

9          Q.   Did you have any problems with the

10    generator?

11         A.   The generator is part of the engine.

12         Q.   How about with the battery bang?

13         A.   No problem.

14         Q.   Did you have an invertor system on the

15    vessel?

16         A.   No.

17         Q.   Approximately how long did the trip to

18    Bar Harbor take?

19         A.   One week.

20         Q.   Was it one week up and one week back?

21         A.   One week total.

22         Q.   One week total?

23         A.   We just sailed up and sailed back.

24         Q.   Did you stop at any other ports on the

37

1    to the Panama Canal, Hawaii and Sausalito where

2    my son lives.  I had a five-year plan with

3    different people joining me at different times.

4              Q.  Between the commencement of the main

5    trip, as you call it, and the voyage back and

6    forth to Bar Harbor, did you take the boat out

7    any other times?

8              A.  We went to Block Island.

9              Q.  Anybody go with you?

10             A.  Yes.  Again with my brother; his wife,

11   Paulette; and my girlfriend.

12             Q.  What is your girlfriend's name?

13             A.  Barbara.  She's here today.

14             Q.  Did you experience any problems on the

15   trip to Block Island?

16             A.  Except for the water maker, no.

17             Q.  Any other trips with the boat?

18             A.  Yes, we did.  Now that I remember, up

19   on the mast we have a radar reflector.  And I

20   remember it because it nearly crowned my

21   girlfriend on the way back.  It fell off the

22   mast and landed within two feet of her head.  It

23   weighs 12 pounds.

24             Q.  Were there any other problems that you

38

1       recall?

2              A.   Not that I can think of right now.

3              Q.   So we have Bar Harbor, Block Island.

4       Any other voyages?

5              A.   No.   That was it.

6              Q.   Where did you store the boat when you

7       were not using it during that period of time?

8              A.   Well, if Eastern Yacht Sales didn't

9       have it, I have a mooring, which is right near

10      Eastern Yacht Sales in Bristol, Rhode Island.

11             Q.   By the way, in the course of your

12      boating history, have you taken any courses in

13      boating safety or in navigation?

14             A.   I have.

15             Q.   Do you recall what those courses are?

16             A.   I took a sailing course way, way back

17      that was two weeks.   That's when I had the small

18      sailboat without an engine.   Then I took a

19      couple of courses with -- I can't think of that

20      organization now.   There's two of them.

21             Q.   If I were to mention either the Coast

22      Guard Auxiliary or the Power Squadron?

23             A.   The Power Squadron.

24             Q.   Do you recall what the courses were

39

1    there?

2         A.   I can't remember.  I was living in

3    Cape Cod at the time.  I don't remember.  One of

4    them was the primary course.  That one I

5    remember.

6         Q.   Have you ever taken any courses in

7    repairing or maintaining marine engines?

8         A.   No.

9         Q.   Have you ever taken any courses at all

10   in electricity or electronics?

11        A.   No.

12        Q.   Sometime in December of the year the

13   fire occurred, did you begin a trip south?

14        A.   I did.

15        Q.   And what was the intention of that

16   trip?

17        A.   The intention of that trip was to

18   go -- I was taking the Intracoastal Waterway,

19   and I was going to end up in the Caribbean.  And

20   from there I was going to be joined, people were

21   going to help me go across the Panama Canal.

22   Then I was going to Hawaii, and from Hawaii, I

23   was going to Sausalito, California.

24        Q.   Do you recall when in December the

40

1    trip began?

2            A.    It was before December.  I think it

3    was the end of November, if I'm not mistaken.

4            Q.    Was anybody going to accompany you on

5    this first leg of the trip?

6            A.    Yes.  My son Ron and his partner Dan.

7            Q.    And you've already testified that you

8    had one stop at Stonington, Connecticut?

9            A.    Yeah.  That's where he got off.

10           Q.    Your son?

11           A.    Yes.

12           Q.    And did his partner get off?

13           A.    Yes.

14           Q.    Did anybody join you in Stonington?

15           A.    No.

16           Q.    Did anybody join you on the vessel at

17   any time prior to the vessel's arrival in Myrtle

18   Beach, South Carolina?

19           A.    No.

20           Q.    Where else did you stop with the

21   vessel en route to South Carolina?

22           A.    I stopped in many places.  I can't

23   think of them all right now.  I stopped in one

24   place on Long Island Sound, and I spent, I

41

1    believe it was two or three days there because

2    of weather.  And I stopped at another place

3    in -- I can't remember the names of the places.

4         I stopped at one place in New York

5    City just before I took the East River.  I

6    stopped one place there.  Then I stopped in

7    descript places on the way down until I got to

8    where the boat is now.

9         Q.  Approximately how many days elapsed

10   between the time you left Rhode Island and the

11   time you arrived at Myrtle Beach?

12        A.  I believe it was three weeks.

13        Q.  And it's my understanding there was

14   nobody accompanying you on the vessel --

15        A.  No.

16        Q.  -- after Stonington?

17        A.  Right.

18        Q.  During these three weeks when the

19   vessel was underway, were you normally sailing

20   or motoring?

21        A.  A little motoring but -- I mean a

22   little sailing.  On the Intracoastal it's mostly

23   motoring.

24        Q.  Did you experience any problems with

42

1      the engine at all?

2              A.   No.

3              Q.   Do you recall how many times you had

4      to get fuel for the engine during these three

5      weeks?

6              A.   I can't remember.

7              Q.   Did you have to -- any problems with

8      the overboard discharge or freshwater -- sea

9      water intake on the engine?

10             A.   No.

11             Q.   Do you know how many hours the boat

12     had on the engine at the time you purchased it?

13             A.   At the time I purchased it?  I don't

14     think it had any.  It was out of the water.

15             Q.   Were you given a manual on the engine

16     along with the other material on the vessel?

17             A.   Yes.

18             Q.   Do you have that manual today?

19             A.   It would be on the boat.

20             Q.   Were you given any cautionary

21     instructions or advice from Eastern Yacht Sales

22     when you finally took delivery about care and

23     maintenance of the engine?

24             A.   No.

43

1          Q.   Did anybody do any work on the engine

2     after the vessel left Stonington?

3          A.   No.

4          Q.   Did you do any work on the vessel?

5          A.   No.

6          Q.   Did you do any sort of work on the

7     vessel after you took delivery yourself, other

8     than maintenance and cleaning?

9          A.   No.

10              MR. FLANAGAN:   Can we take a

11     two-minute break?

12              (Recess taken)

13     BY MR. FLANAGAN:

14          Q.   Tell me, beginning with the day before

15     the fire, were you in Myrtle Beach at the time,

16     or were you still navigating toward Myrtle

17     Beach?

18          A.   I was still navigating to Myrtle

19     Beach.

20          Q.   When did you arrive?

21          A.   I arrived the night of the fire.   I

22     don't have a date right now, but it was the

23     night of the fire.

24          Q.   Nobody was aboard the vessel but

44

1    yourself?

2        A.   Just myself.

3        Q.   What were the weather conditions?

4        A.   The weather conditions were cold.

5        Q.   When you say the night, approximately

6    what time did you arrive in the Myrtle Beach

7    area, what time of day or evening?

8        A.   I'd say maybe 5:00 to 6:00.

9        Q.   Did you experience any problems with

10   the vessel that day?

11       A.   Not at that time, no.

12       Q.   Did you experience any problems

13   approaching the Myrtle Beach area?

14       A.   No.

15       Q.   I take it it was after dark?

16       A.   No.  It was just before dark.  I

17   always try to stop before dark.  I don't like to

18   travel on the Intracoastal after dark.  It's

19   just too narrow.

20       Q.   What time of the evening did you say

21   you were out?

22       A.   Well, that's why I say I believe it

23   was around 6:00.  I could be wrong.  It was

24   before dark.

```
 1              Q.   It was before dark?

 2              A.   Yeah.

 3              Q.   Did you experience any navigational

 4       problems getting into the harbor?

 5              A.   No.   The Intracoastal was like a

 6       river.

 7              Q.   Had you made arrangements to tie up

 8       marina or rent a mooring?

 9              A.   Not that night, no.

10              Q.   Did the vessel have a problem with

11       grounding before you anchored for the evening

12       before mooring?

13              A.   Not that day, no.

14              Q.   How long were you in Myrtle Beach

15       before the fire?

16              A.   It was just that night.

17              Q.   During your trip on the Intracoastal

18       Waterway, at any time did you ground the vessel

19       out and have to work it off a sandbar?

20              A.   Yes.

21              Q.   How long before you approached Myrtle

22       Beach was that?

23              A.   It happened a few times.   It was soft

24       groundings.   I don't know if it was the day
```

1    before or two days before. It happened quite a

2    bit on the Intracoastal.

3        Q.   What did you do to get the vessel off

4    when you ground it?

5        A.   Just put it in reverse and back up.

6        Q.   Did you have to rock it once in a

7    while?

8        A.   No.  It was very easy.  It's very slow

9    going, so you don't and it's all soft ground.

10       Q.   When you got to Myrtle Beach in the

11   Intracoastal, how did you moor or anchor or tie

12   up for the evening?

13       A.   That night I just -- it was a small,

14   just a small area off the Intracoastal, and I

15   just dropped my anchor and anchored for the

16   evening.

17       Q.   Approximately what time did you drop

18   the hook?

19       A.   Just before dark.

20       Q.   And would you take me from there up

21   until the point that you realized there was

22   something --

23       A.   Please?

24       Q.   Would you take me from that point in

47

1    time up until the point in time you realized

2    there was something going on in the boat?

3         A.   I made myself something to eat, and I

4    did a little bit of reading.  And I started the

5    water heater -- not the water heater, the

6    heating system -- and the engine was running.

7              And I went to bed to listen to a book

8    because I do that all the time.  I listen to

9    books on tape.  And I was in my bed listening to

10   a book on tape.  And at some point, I don't

11   remember how long it was, but at some point my

12   eyes started burning.

13              So I got up.  And as soon as I opened

14   up my door, I noticed that the salon was full of

15   smoke.  I tried to get to the fire, but I

16   couldn't.  So I went back into my room, closed

17   the door, and I grabbed a few belongings that I

18   could and I went out the hatch.

19              And I couldn't get to the back of the

20   boat because there was too much smoke coming out

21   to the boat, so I couldn't get to the dinghy.  I

22   had my -- not kayak -- yeah, kayak, on the front

23   of the boat.  So I threw the kayak in the water,

24   and I jumped into the kayak, and I called the

48

1    Coast Guard with my cell phone.

2            And they sent -- they came down with

3    the fire department.  It took about 45 minutes,

4    but they got there.

5        Q.  You were running both the engine and

6    the heating system?

7        A.  Yes.  The heating system throws a lot

8    of electricity.  I was charging the batteries.

9        Q.  So the heating system works off --

10       A.  The batteries.

11       Q.  So you have to keep the batteries

12   charging while you're running the heating

13   system?

14       A.  You don't have to keep it charging

15   while you're running, but I just did it.  I

16   figured while one is running, I could run the

17   other one and shut the boat off at the same

18   time.

19       Q.  Had you done something similar in

20   other parts of the voyage south?

21       A.  Yes.

22       Q.  Would it be mandatory to run the

23   engine all evening?

24       A.  Not all evening, no.

56

A.  Did I?

Q.  Contact anybody the evening of the

fire other than the Coast Guard?

A.  I called home, but I don't remember if

it was that evening.  It could have been the

next morning.  By the time they got me to the

hotel, it was pretty late.  I don't think I

called anyone that evening.  It might have been

the next morning.

Q.  Who took you to a hotel?

A.  The fire department.

Q.  You said you called home that evening

or the next morning?

A.  Yes.

Q.  Who was at home to call?

A.  Barbara, my girlfriend Barbara.

Q.  At some point did you report this

incident to your insurance carrier?

A.  I did.

Q.  Did you also contact Eastern Yacht

Sales?

A.  That I'm not sure.  I called the

insurance company I think it was either the next

day or the day after.  They sent a man down.

1        Q.   What insurance company did you call?

2        A.   I think it's Blue Water Insurance but

3    I'm not sure.   I don't remember the name.

4        Q.   Do you know where they're located?

5        A.   I believe they're located in Florida,

6    but the insurance was done through a big

7    company.   Not in this country.

8        Q.   What broker did you use for insurance?

9        A.   Blue Water Insurance.

10       Q.   Do you know the name of the individual

11   that you talked to down there?

12       A.   No, I don't.

13       Q.   Did you use them for insurance before

14   this?

15       A.   No, I hadn't.

16       Q.   On the other vessels you've owned,

17   have you ever had any insurance claims?

18       A.   No.

19       Q.   Have you ever had any fires?

20       A.   No.

21       Q.   Have any of those vessels ever been

22   lost or sunken?

23       A.   No.

24       Q.   Who was the gentleman that arrived

```
 1        after you called Blue Water?

 2             A.   I can't think of the name.  It was the

 3        insurance adjuster.  They sent an insurance

 4        adjuster.  I don't know his name.  I just can't

 5        think.  I can't remember right now.  He was the

 6        adjuster.  He came down and surveyed the boat.

 7             Q.   Was there only one person that

 8        arrived?

 9             A.   At that time, yes.

10             Q.   Would his name have been Godfrey?

11             A.   No.  Godfrey is the investigator.

12             Q.   Would his name have been Grant?

13             A.   Yes.

14             Q.   What was your understanding of his

15        duties at the scene?

16             A.   He was to survey the boat and

17        determine the amount of damage.

18             Q.   Did he survey the boat?

19             A.   He did.

20             Q.   Did you have discussions with him

21        about his survey?

22             A.   No, not too much, no.

23             Q.   Were you there when he did the survey?

24             A.   I was.
```

59

1      Q.  Have you ever seen a copy of the

2   survey?

3      A.  I did.

4      Q.  I'm going to show you this document

5   and ask you if you recognize this as a copy of

6   Mr. Grant's survey?

7          (Pause)

8          MR. COHEN:  Let me see the document

9   before you answer the question.

10         (Pause)

11         MR. COHEN:  What's the pending

12  question?

13         MR. FLANAGAN:  Does he recognize that

14  as a copy of Mr. Wagner's survey.

15     A.  As far as I can make out, yes.  I have

16  a lot of trouble reading now.  Words don't come

17  to me.  But it looks like it.

18     Q.  At one point in time did you see a

19  copy of this prior to today?

20     A.  I looked at that.

21     Q.  What, if anything, is your

22  understanding of your conclusion of Mr. Wagner's

23  survey?

24     A.  I didn't think it was enough.

60

1        Q.  Did he give you a written number as to

2    what he thought the repairs would cost on the

3    vessel?

4        A.  He thought it was somewhere around

5    120, if I remember.

6        Q.  Is that in writing?

7        A.  No, I don't believe so.

8        Q.  You paid, I believe you testified,

9    $350,000 for the vessel.  Did you also pay for

10   additional work over and above the 350?

11       A.  Yes.

12       Q.  Do you recall how much that was, sir?

13       A.  No, I don't.

14       Q.  You had the vessel insured at this

15   time --

16       A.  Yes.

17       Q.  -- did you not?

18           And do you know what the amount of

19   insurance on the vessel was?

20       A.  I believe it was 400, but I'm not

21   positive.

22       Q.  Did you also have some of your

23   personal gear insured separately?

24       A.  I had personal gear, but it wasn't

1    insured separately.

2         Q.  Did you at any time object to

3    Mr. Wagner's statements or his conclusions?

4         A.  No.

5         Q.  You testified you thought the number

6    he gave you was not enough?

7         A.  I didn't think so, no.

8         MR. ANGELONE:  Did you say Mr. Wagner?

9         MR. FLANAGAN:  I'm sorry.  It's

10   Mr. Grant.  It's Wagner Associates.

11        MR. COHEN:  It's actually Wager

12   Associates.

13        MR. FLANAGAN:  You're right.  I don't

14   read good either.

15        MR. COHEN:  I knew who you meant.

16        Q.  At any time, did you submit a written

17   notice of claim to your insurance carrier?

18        A.  I didn't, no.

19        Q.  Do you know if anybody did on your

20   behalf?

21        A.  No, no one did.

22        Q.  Do you know why that is?

23        A.  I thought the insurance adjuster

24   submitted it.

62

1        Q.  Did you ever receive any

2    correspondence from your insurance carrier

3    offering to settle the claim?

4        A.  Well, they told me that they would pay

5    for the damages.

6        Q.  Did they tell you what they would pay?

7        A.  They told me they thought it was

8    between 80 and $120,000.

9        Q.  Did they offer to pay a lump sum

10   amount to you or did they offer to fix the boat?

11       A.  They offered to pay for the boat.

12       Q.  And is there a reason that you didn't

13   take them up on that offer to fix the boat?

14       A.  The reason I didn't take them up on

15   that offer is they told me that because the boat

16   was new and it shouldn't burn, that they had to

17   hire a fire investigator.  And after the results

18   of what the fire investigator found, I didn't

19   want a fixed-up boat.  I wanted a brand-new

20   boat.  And at the time I offered that to

21   Mr. Stromberg.

22       Q.  Let me go back.  You said that the

23   insurance carrier, also your insurance carrier,

24   also hired some fire investigators?

65

1        A.   Yes.

2        Q.   When you weren't aboard?

3        A.   Yes.

4        Q.   Describe to me to the best of your

5  recollection the type of damage you have since

6  viewed in the vessel.

7        A.   The type of damage in the vessel?

8        Q.   Yes.

9        A.   Okay.  The two guest compartments, I

10  call them, were burnt; the main salon was

11  totally damaged.

12        Q.   Let me stop you there.  Are the guest

13  compartments --

14        A.   On either side of the engine.

15        Q.   -- the small rooms on either side of

16  the engine compartment?

17        A.   Yes.

18        Q.   Were they burned, or were they just

19  dirty from smoke?

20        A.   Burned, one worse than the other.

21  They were both burned.

22        Q.   Were the bulkheads going into the

23  engine compartment burned?

24        A.   Yes.  Wait a minute.  I'm sorry.  What

66

1      do you mean by that?  Going into those

2      compartments?

3              Q.    Yes.

4              A.    The doors?

5              Q.    Yes.

6              A.    Yes.

7              Q.    Tell me about the salon.  What sort of

8      damage did you see in the main salon?

9              A.    The main salon was mostly melting,

10     some burning but mostly melting from the extreme

11     heat.  But there's -- like there's one small

12     vent over the stove, and that remains, always

13     remains open.  And that burnt all the way

14     through and out to the outside on the boat.

15              And the companionway was totally

16     burnt.

17              Q.    Is this the companionway going from

18     the main salon up to the cockpit?

19              A.    Yes.

20              Q.    And that is located just forward of

21     the engine compartments?

22              A.    Over the engine.

23              Q.    Was there any burning damage in the

24     cockpit?

67

1    A. Very little, very little.  Mostly

2 around the companionway.  Then there's some

3 damage as far as the staining, but mostly just

4 the companionway, companionway hatch.  One of

5 the hatches over one of the small cabins burned

6 and some fire got out and burnt the canvas above

7 it.

8    Q. Would it be fair to say that the bulk

9 of the actual burning or flame impingement was

10 centered mostly in the engine compartment,

11 although some flames escaped?

12    A. Yes.

13    Q. Would it also be fair to say that the

14 bulk of the other damages from the fire were

15 either some melting or smoke damage?

16    A. Yes.

17    Q. Was the integrity of the hull breached

18 in any way?

19    A. No.

20    Q. Prior to the fire, had you examined

21 the bilges of the vessel?

22    A. No.

23    Q. Not at all?

24    A. Not that day, no.

73

1           A.   No.

2           Q.   Did he return them to you?

3           A.   No.   He just -- he included them in

4      his report.

5           Q.   Did the person from Mr. Godfrey's firm

6      take anything other than the wiring bundle off

7      the vessel?

8           A.   No.

9           Q.   Did he tell you he was taking the

10     wiring?

11          A.   Because he found something there that

12     showed him what he thought was the cause of the

13     fire.

14          Q.   At some later point in time did you

15     see a report from Mr. Godfrey's firm?

16          A.   I did.

17          Q.   At some point in time did you also see

18     a copy of a report from the -- I think it's the

19     Harris County Fire Department?

20          A.   I did.

21          Q.   Are you aware the reports come to

22     different conclusions where the fire started?

23          A.   No, I'm not.

24          Q.   What is your understanding of where

74

1    the fire started?

2         A.   My understanding is it started with a

3    short in the wiring, an unfused wire.

4         Q.   But you never saw the conclusions that

5    the Harris County -- let me go back.

6              Where is the location of the short

7    that you understand caused the fire?

8         A.   It was in that wiring bundling.

9         Q.   Do you know where that wiring bundle

10   was located?

11        A.   I have an idea, but I'm not totally

12   sure, no.

13        Q.   Do you know whether it was on the port

14   or starboard side of the engine?

15        A.   I believe it was on the starboard.

16        Q.   Have you ever seen the conclusions of

17   the fire department?

18        A.   I did.  I have it at home.

19        Q.   Are you aware that the fire department

20   found that the fire began on the opposite side

21   of the engine compartment?

22        A.   No, I don't.

23        Q.   Do you consider that wiring bundle

24   still to be your property at this time?

1    people working on the vessel, you knew some were

2    from Eastern Yacht and some were from Cay?

3            A.   Yes.

4            Q.   And you readily could distinguish

5    between those two?

6            A.   Oh, yeah.   They had names on their

7    shirt.

8            Q.   So one would have a Cay name.   That's

9    a good way of doing it.

10           And primarily the Cay people were

11   working on the electronics?

12           A.   Yes.

13           Q.   Did you actually observe what the Cay

14   people were working on?

15           A.   Not all the time, but yes.

16           Q.   Did they work in the area where this

17   so-called wiring bundle was removed; that is,

18   between the engine and the control?

19           A.   As far as my recollection, no.   They

20   were working mainly on the -- where you sit and

21   you got all your controls.

22           Q.   So that would be both in the

23   cockpit -- and did you have a control center

24   below?

86

1          A.   Yes.

2          Q.   You had two?

3          A.   Well, the main one is down below.

4          Q.   And they worked on that?

5          A.   Yes.

6          Q.   Did they actually install electronics

7     and wires, et cetera?

8          A.   They did.

9          Q.   But you don't know exactly where they

10    were attached to or how they got their energy

11    source?

12          A.   No, I don't.

13          Q.   I want to try to do this so somebody

14    else can ask questions.

15               You indicated that the next day after

16    this incident you reported this incident to your

17    insurance company?

18          A.   I did.

19          Q.   Did you have your insuring agreements

20    or a piece of paper on board the vessel which

21    told you who to call or contact in case there

22    was an occurrence?

23          A.   I didn't go back on board the vessel,

24    so it couldn't have been there.  I don't know if

95

1          A.   From the fire investigator.

2          Q.   And you indicated that he took the

3     wire bundle with him?

4          A.   Yes.

5          Q.   And is it your understanding he still

6     has it?

7          A.   Yes.

8          Q.   And can you tell me your understanding

9     as to what you understand is contained in the

10    wiring bundle that Mr. Godfrey has?

11         A.   Well, from my understanding, is the

12    wiring bundle, the wiring, I gather, went from

13    the battery compartment, and there was an

14    unfused wire that went from the battery

15    compartment to the control panel in the cockpit.

16         Q.   Do you know what charge it carried?

17         A.   No, I don't.

18         Q.   Where did it go from, from the

19    batteries to what?

20         A.   The control panel in the cockpit.

21         Q.   And what is your understanding as to

22    the cause of the fire?

23         A.   That it chafed -- the wires are

24    chafed.

1          Q.   And do you know what the wire chafed

2     with?   Do you have an understanding?

3          A.   I read it many times.   It's there.   I

4     don't remember what it is.

5          Q.   Do you have an understanding as to

6     whether Cay Electronics -- I believe it's

7     spelled C A Y, but it's pronounced key -- as to

8     whether or not Cay Electronics did any work in

9     the area of that bundle?

10         A.   As far as I know, they didn't do any

11    work in there.

12         Q.   You indicated that there may have been

13    some other people that were hired by Eastern

14    Yacht that had done work on the vessel prior to

15    its delivery?

16         A.   Yeah.   The only one that I actually

17    know of that did work in that area was the

18    mechanic who came to put bolts back into the --

19    the trouble I had in Stonington, Connecticut.

20    Besides that, I don't know anybody who worked in

21    that exact area.

22         Q.   Refresh me as to what the bolts were

23    for.   I know it was in Stonington, Connecticut

24    on your way down.

99

1          Q.   Were there individual wires?  Were

2     they contained within any kind of insulation?

3          A.   From what I've read on the report,

4     they were insulated.

5          Q.   Do you make any claim that Cay

6     Electronics did anything to cause the fire?

7          A.   No, I don't.

8          Q.   Do you make any claim that Eastern

9     Yacht Sales -- strike that.

10          Do you make any claim that any of the

11     other subcontractors of Eastern Yacht Sales

12     caused the fire?

13          A.   No, I don't.

14          Q.   As I understand it, your claim is that

15     it was a manufacturing defect?

16          A.   That's what I was told by the fire

17     investigator.

18          Q.   Is there any other claim that you make

19     against Eastern Yacht Sales other than being the

20     seller of the yacht?

21          MR. COHEN:   I'm going to object to the

22     question.  If you know.

23          MR. COLLINS:   It's only his

24     understanding.

1           MR. COHEN:  Your understanding of the

2      claims that you're making in this case.

3           A.   Repeat your question.

4           Q.   Sure.  Did you make any claim against

5      Eastern Yacht Sales other than as the seller of

6      the yacht?

7           MR. COHEN:  Objection.  You can answer

8      the question.

9           A.   No.

10          Q.   You indicated that when you first saw

11     the yacht, it was out of the water?

12          A.   Yes.

13          Q.   You were looking at a Catalina?

14          A.   Yes.

15          Q.   And where did you see that ad?

16          A.   I didn't see an ad.  I just happened

17     to stop in at this store.

18          Q.   I thought I saw somewhere -- had you

19     bought anything from Eastern Yacht of Rhode

20     Island before?

21          A.   No.

22          Q.   Did you have a mooring in Bristol

23     prior to the purchase --

24          A.   No, I didn't.

108

1          A.   Yes.

2          Q.   That first trip, that you did a sea

3     trial.  You accepted the vessel, and you made

4     payment on the vessel?

5          A.   Yes.

6          Q.   And you also testified, I believe,

7     that there was certain work that was in the

8     scope of the purchase agreement which had not

9     yet been done?

10          A.   Mm-hmm.

11          Q.   And was done after your return from

12     Bar Harbor?

13          A.   Yes.

14          Q.   Is that correct?

15          A.   Yes.

16          Q.   Now, was there any work that was

17     beyond the scope of purchase agreement --

18          A.   Not at that time.

19          Q.   If I could finish my question, sir.

20               Was there any work beyond the scope of

21     the purchase agreement which you contracted for

22     directly which was done in Portsmouth prior to

23     your trip south to Myrtle Beach?

24          A.   No.

109

1        Q.   But you did pay Cay Electronics

2   directly for some work?

3        A.   A little bit, yes.

4        Q.   Wasn't that work outside the scope of

5   the agreement?

6        A.   No.   That was just I was just told by

7   Mr. Collins that they would probably charge me

8   less if I paid them directly for the items, and

9   they didn't.

10        Q.   Well, is that why you were having some

11   work done through Eastern Yacht Sales, because

12   it would -- strike that.

13             When you accepted purchase of the

14   boat, did you tender full payment for the boat,

15   for everything on the boat?

16        A.   I don't remember if I paid full

17   payment because there's still some work that had

18   to be done.

19        Q.   And you don't know if you reserved

20   some payment?

21        A.   I don't remember.

22        Q.   Is it possible you paid the full

23   contract price upon acceptance of the boat and

24   then asked for additional work beyond the scope

110

1    of the contract?

2         A.   No.   We didn't have any additional

3    work done.

4         Q.   I'm a boater.   I'm always curious

5    about names.   How did the vessel get its name

6    the Phoenix?

7         A.   I was following a truck that does -- a

8    cement truck.   I was following a cement truck

9    home one day, and I thought of the name Phoenix,

10   and it struck me.

11        Q.   So you chose the name?

12        A.   I chose the name.

13        Q.   Now, your son was a co-owner of the

14   ship as well?

15        A.   Yes.

16        Q.   Did he contribute to the purchase

17   price at all?

18        A.   Yes, a little bit.

19        Q.   And your testimony is he left in

20   Stonington?

21        A.   Yes.

22        Q.   And I may have missed this, and I

23   apologize if you've already gone over this.   Why

24   did your son and his partner leave in

1

1          COPY                    Volume: I

2                                  Pages: 1-53

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5     - - - - - - - - - - - - - - - - - x

6     ROBERT L. LUSSIER, ET AL.,

7                   Plaintiffs,

8          v.

9     EASTERN YACHT SALES, INC.,

10    JEANNEAU AMERICA, INC., and

11    CHANTIERS JEANNEAU,

12                   Defendants.

13    - - - - - - - - - - - - - - - - - x

14          DEPOSITION of RON LUSSIER, a witness

15    called by counsel for Jeanneau America, Inc.,

16    taken pursuant to the applicable provisions of

17    the Federal Rules of Civil Procedure, before

18    Toni F. Beckwith, Registered Merit Reporter, CSR

19    No. 111293 and Notary Public in and for the

20    Commonwealth of Massachusetts, at the Offices of

21    Clarkin, Sawyer & Phillips, PC, 20 William

22    Street, Wellesley, Massachusetts, on Tuesday,

23    September 6, 2005, commencing at 1:50 p.m.

24

2

1      APPEARANCES:

2

3          ROBERT G. COHEN, ESQUIRE

4          188 Oaks Road

5          Framingham, Massachusetts 01702

6          Counsel for the Plaintiffs

7

8          BAKER BRAVERMAN & BARBADORO PC

9          By William B. Golden, Esquire

10         50 Braintree Hill Park

11         Braintree, Massachusetts 02184

12         Counsel for Eastern Yacht Sales

13

14         FLANAGAN & HUNTER, P.C.

15         By Brian P. Flanagan, Esquire

16         88 Black Falcon Avenue, Suite 274

17         Boston, Massachusetts 02210

18         Counsel for Jeanneau America, Inc.

19

20         HODOSH SPINELLA & ANGELONE PC

21         By Thomas C. Angelone, Esquire

22         One Turks Head Place, Suite 1050

23         Providence, Rhode Island 02903

24         Counsel for Chantiers Jeanneau

3

1          CLINTON & MUZYKA

2          By Robert Collins, Esquire

3          One Washington Mall

4          Boston, Massachusetts 02108

5          Counsel for OneBeacon Insurance

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

5

1                    P R O C E E D I N G S

2              MR. FLANAGAN:  Why don't we start.

3        You can swear him in.

4

5                    RON LUSSIER,

6        having been satisfactorily identified by the

7        production of his, driver's license, and duly

8        sworn by the Notary Public, was examined and

9        testified as follows:

10

11                   DIRECT EXAMINATION

12       BY MR. FLANAGAN:

13              Q.  Is it Ronald?

14              A.  Ron.

15              Q.  Ron.

16              MR. FLANAGAN:  Off the record.

17              (Discussion off the record)

18       BY MR. FLANAGAN:

19              Q.  Would you state your full name for the

20       record?

21              A.  Ron Lussier.

22              Q.  And your current address?

23              A.  67 Crescent Avenue, Sausalito,

24       California.

OMB APPROVED
2115-0110

| DEPARTMENT OF<br>TRANSPORTATION<br>U.S. COAST GUARD<br>CG-1340 (REV. 9-92) | **BILL OF SALE** | THIS SECTION FOR COAST GUARD USE ONLY |
|---|---|---|

| 1. VESSEL NAME<br><br>2003 Jeanneau 45.2 | 2. OFFICIAL NUMBER<br>OR HULL ID NUMBER<br>FR-IRI 00572G203 | |

3. NAME(S) AND ADDRESS(ES) OF SELLERS:

Eastern Yacht Sales of Rhode Island
39 Alexander Road
Portsmouth, RI 02871

RECORDED:

BOOK:                    PAGE:

PORT (IF NOT FILING PORT)

3A. TOTAL INTEREST OWNED (IF LESS THAN 100%)          %

DOCUMENTATION OFFICER

4. NAME(S) AND ADDRESS(ES) OF BUYER(S) AND INTEREST TRANSFERRED TO EACH:

Robert L. Lussier                  Ron Lussier
33 Trenton Street                  67 Crescent Ave
Bellingham, MA 02019               Sausalito, Ca 94965

4A. TOTAL INTEREST TRANSFERRED (100% UNLESS OTHERWISE SPECIFIED)          %

4B. MANNER OF OWNERSHIP. UNLESS OTHERWISE STATED HEREIN, THIS BILL OF SALE CREATES A TENANCY IN COMMON, WITH EACH TENANT OWNING AN EQUAL UNDIVIDED INTEREST. CHECK ONLY ONE OF THE FOLLOWING BLOCKS TO SHOW ANOTHER FORM OF OWNERSHIP.

☐ JOINT TENANCY WITH RIGHT OF SURVIVORSHIP   ☐ TENANCY BY THE ENTIRETIES   ☐ COMMUNITY PROPERTY

☐ OTHER (DESCRIBE)

5. CONSIDERATION RECEIVED:

(ONE DOLLAR AND OTHER VALUABLE CONSIDERATION UNLESS OTHERWISE STATED)

6. I (WE) DO HEREBY SELL TO THE BUYER(S) NAMED ABOVE, THE RIGHT, TITLE AND INTEREST IDENTIFIED IN BLOCK 4 OF THIS BILL OF SALE IN THE PROPORTION SPECIFIED HEREIN.

VESSEL IS SOLD FREE AND CLEAR OF ALL LIENS, MORTGAGES, AND OTHER ENCUMBRANCES OF ANY KIND AND NATURE, EXCEPT AS STATED ON THE REVERSE HEREOF. VESSEL IS SOLD TOGETHER WITH AN EQUAL INTEREST IN THE MASTS, BOWSPRIT, SAILS, BOATS, ANCHORS, CABLES, TACKLE, FURNITURE, AND ALL OTHER NECESSARIES THERETO APPERTAINING AND BELONGING, EXCEPT AS STATED ON THE REVERSE HEREOF.

| 7. SIGNATURE(S) OF SELLER(S) OR PERSON(S) SIGNING ON BEHALF OF SELLER(S). | 8. DATE SIGNED<br><br>6/30/03 |
|---|---|

9. NAME(S) OF PERSON(S) SIGNING ABOVE, AND LEGAL CAPACITY IN WHICH SIGNED (E.G., OWNER, AGENT, TRUSTEE, EXECUTOR)

Patrick A. Turner,     VP

10. ACKNOWLEDGMENT (TO BE COMPLETED BY NOTARY PUBLIC OR OTHER OFFICIAL AUTHORIZED BY A LAW OF A STATE OF THE UNITED STATES TO TAKE OATHS.)

ON ____6/30/03____   THE PERSON(S) NAMED IN SECTION 9     STATE: RHODE ISLAND
        (DATE)
ABOVE ACKNOWLEDGED EXECUTION OF THE FOREGOING INSTRUMENT     COUNTY: NEWPORT
IN THEIR STATED CAPACITY(IES) FOR THE PURPOSE THEREIN
CONTAINED:

NOTARY PUBLIC  N. Grace

MY COMMISSION EXPIRES  6/16/05

PREVIOUS EDITION OBSOLETE                                        SN 7530-00-F01-1020

# Jeanneau America, Inc.

**Invoice**

105 Eastern Avenue, Suite 202
Annapolis, MD 21403
410-280-9400

| DATE | INVOICE # |
|------|-----------|
| 8/8/2002 | 802910 |

| BILL TO |
|---------|
| Eastern Yacht Sales |
| 39 Alexander Road |
| Melville Marina District |
| Portsmouth, RI 02871 |

| P.O. NO. | TERMS | PROJECT |
|----------|-------|---------|
| | Due on receipt | 56082/S 45.2 572 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|-------------|-----|------|--------|
| Jeanneau SO 45.2 #572 | 1 | 240,153.00 | 240,153.00 |
| Order 56082 | | | |
| Stock | | | |
| Out-of-state sale, exempt from sales tax | | 0.00% | 0.00 |

We appreciate your prompt payment.

| Total | 240,153.00 |

page1

Bob Lussier                                                              4/14/2003

| Jeanneau 45.2 with Standard Equipment, Freight, Bottom Paint and RL( | $277,116 |
|---|---|

**Optional Equipment:**

| | |
|---|---|
| 75hp Yanmar | 3,771 |
| Shoal Keel | 1,200 |
| Tall Furling Mast | 3,787 |
| Blue Awlgrip Paint | 6,300 |
| Chromed Dorades | 1,565 |
| Aluminum Turnbuckles | 225 |
| Mattress Battens in Forward Cabin | 435 |
| Outboard Motor Bracket | 145 |
| Spur on Propeller Shaft | 288 |
| Salons/Cabins Blue Diamond/Yellow Point | Std |
| Additional Battery | 228 |
| Bow Thruster in Tunnel – 90kg/f-twin propellers | 8,372 |
| Electric Head - Forward | 830 |
| Y-valve for Forward Holding Tank | 321 |
| Y-valve for Forward aft Holding Tank | 321 |
| 2 Opening Portholes instead of fixed | 631 |
| Large Profile Teak Rubrail | 1,025 |
| Electric Roof Winch | Incl |
| Teak Cockpit Table w/Blue Cover | 1,453 |
| Harken Mainsheet Tracks and Genoa Tracks | Incl |
| 2nd Windlass Control w/chain Counter | 627 |
| Chromed Compass Lights, Thru-hulls, deck fillers | 690 |
| Deluxe Salon Table | Incl |
| Bar Chest in Salon | 763 |
| Dressing Table in Forward Cabin | 1,286 |
| Waterproof Cockpit Speakers | 366 |
| Wind Instrument | |
| Tridata Instrument | |
| Wind Repeater | |
| Tridata Repeater | |
| ST 6001 Plus Type 2 Autopilot | |
| Raymarine RL70 Color Chart Plotter | 14,924 |

Sub Total                                                              $326,619

*Robert L Lussier*

4/22/03

page 2

Bob Lussier

Jeanneau 45.2 # 572

Additional items

| | | |
|---|---|---|
| Dodger with handrails | Your color choice | 1693 |
| Bimini top | Your color choice | 1693 |
| Diesel forced air heat | | 4170 |
| 12 volt fridge in freezer box | | 1819 |
| Fresh water maker / Spectra MD300 300 gal a day | | 11936 |
| 10.4" color plotter / GPS at helm RL80CRC | | 8374 |
| Radome scanner 4KW mounted on the mast | | 3606 |
| Single side band radio Icom M802 SSB/HAM 150 watt / AT-140 Anenna | | 3105 |
| Icom M602 VHF with RAM mic | | 0 |
| Coast Guard safety equipment and docking equipment | | 0 |

| | |
|---|---|
| Total boat and option price | $363,015 |
| Incentive | -17619 |
| Additional Incentive | -10000 |
| Trade on 1987 Catalina 30 (pending survey) | -31500 |
| Sub Total | $303,896 |
| Additional discount | ($8,896) |
| Total | $295,000 |

Contingent on the closing of the house
Deal to close on or before June 30 2003
Trade delivered to Portsmouth as soon as possible

| | |
|---|---|
| Deposit | -1000 |
| Balance | $294,000 |

Thank You

4/31/22

Bob Lussier

Safety and docking equipment
2003 Jeanneau 45.2
West Marine

| | Part # | West reg |
|---|---|---|
| Life jackets 4 pack for guests Type II | 595134 | 29.99 |
| Anchor rode and chain combination<br>50' 3/8 chain<br>200' 3/4 Nylon | | 224.99 |
| CQR anchor (45lb) | | 499.99 |
| 3/4 x 35' dock line pre-spliced (blue) | | 54.99 |
| | | 54.99 |
| 3/4 x 25' dock line pre-spliced (blue) | | 54.99 |
| | | 54.99 |
| 10" x 22.5" Fenders (blue) 4 each | | 33.99 |
| | | 33.99 |
| | | 33.99 |
| | | 33.99 |
| Orion deluxe flare / location kit | 291222 | 54.99 |
| Tempo signal horn | 597114 | 13.99 |
| Orion weekend medical kit | 358160 | 34.99 |
| Fire extinguisher (Mariner 10) 3 each | 126219 | 15.99 |
| | 126219 | 15.99 |
| | 126219 | 15.99 |
| Total | | 1262.83 |

4/30/03

EASTERN YACHT SALES RI.
10


4275291100110066
DATE 05/01/03
TIME 02:07 PM

ITEM: 001  VIS SALE
ACCT: 4264293145012974
 EXP: 0305 S
RESP: AUTH/TKT  015503

TOT: $1000.00

I AGREE TO PAY ABOVE
TOTAL AMOUNT ACCORDING
TO CARD ISSUER AGREEMENT
(MERCHANT AGREEMENT IF
CREDIT VOUCHER)

X _____
  SIGNATURE

COPY-CUSTOMER



Received 12/03/04, 10:23PM, [06:20] on line [5] for ADMINISTRA...  Pg 2/13

Dec-'03-04 10:19am  From-BAKER BRAVERMAN BARBADORO    PC      7818489790        T-552  P.02    F-030
FROM : EASTERN YACHT SALES-PORTSMOUTH   PHONE NO. : 401 683 0301      Nov. 20 2004 04:40PM P2



# CERTIFICAT DE LIVRAISON ET DE PRISE EN CHARGE
## *DELIVERY AND RELEASE CERTIFICATE*

**JEANNEAU**   Warranty cert mailed on 8/19/03    ①

### CARACTÉRISTIQUES DU NAVIRE / *BOAT SPECIFICATIONS*

Modèle /*Model* : __Sun Odyssey 45.2__ Millésime / *Year* : __2003__

N° Série / *Serial number* : __572__

Moteur type / *Engine brand* : __Yanmar 75cv__ __12786__

### ACHETEUR / *PURCHASER/USER*

NOM / *Name* : __Nussier__    PRÉNOM / *First name* : __Robert__

ADRESSE / *Address* : __33 Trenton Street__

Code Postal / *Post Code* : __02019__  Ville /*City* : __Bellingham, MA__

Tél. / *Tel* : __505-350-8086__   Age / *Age* : _____

Profession / *Occupation* : _____

Déclare avoir réceptionné ce jour le navire, sus désigné, et qu'il ne présente aucun défaut ou vice apparent ou connu.
Déclare avoir reçu de mon vendeur le manuel du propriétaire et toutes les informations ou instructions nécessaires pour le manœuvrer, l'utiliser et faire fonctionner les accessoires en toute sécurité.
Atteste avoir pris connaissance des conditions générales de garantie, figurant dans le manuel du propriétaire.

*This document certifies that I, the undersigned, purchaser/user, did on this day stated below take delivery of the aforementioned vessel, and that there were no apparent flaws or visible known defects.
I do hereby certify that I have received from the seller stated below the owner's manual and all required information and/or instructions to navigate, use and operate this vessel and all accessories in a safe manner.
I do hereby certify that I have read and understood the general terms of warranty which are included in the owner's manual.*

Fait à / *at* __Robert Nussier__, le/ *on* __8/12/03__

Signature de l'acheteur
précédée de la mention manuscrite
"Lu et Approuvé"
*Purchaser / User signature
Please write before signing —
"Read and Approved"*

Eastern Yacht Sales of RI, Inc.
39 Alexander Road
Melville Marina District
Portsmouth, RI 02871
401-683-2200 www.easternyacht.com

David Riel

"A"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2005 SEP 27  P 2: 05

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| ROBERT L. LUSSIER et als | } |
| Plaintiff | } |
| | } |
| v. | } |
| | } |
| EASTERN YACHT SALES OF RI, INC.; | } |
| EASTERN YACHT SALES, INC.; | } |
| JEANNEAU AMERICA, INC.; and | } |
| CHANTIERS JEANNEAU, | } |
| Defendants | } |

## THIRD AMENDED COMPLAINT AND JURY CLAIM

### Introductory Statement

1.  This is an action by the plaintiffs, as buyers/owners of a certain sailing vessel
    known as "The Phoenix," against the retail boat dealer, the manufacturer of
    the boat, and the company which imported the boat to the United States from
    its point of manufacture in France. Plaintiffs seek damages for the value of the
    boat as of on or about December 4, 2003 when the vessel was substantially
    damaged by an on-board fire caused by a manufacturing defect at the point of
    its manufacture and/or at the point of its "fit up" prior to delivery of the boat
    to the plaintiffs caused by the negligence of the defendants and/or breaches of
    the warranties applicable to this boat.

### Parties

2.  Plaintiffs Robert L. Lussier and Ronald Lussier are the buyers/owners of the
    S/V Phoenix. Plaintiff Robert L. Lussier is an individual presently of 33
    Trenton Street, Bellingham, Norfolk County, Massachusetts. Plaintiff Ronald
    Lussier is an individual presently of 67 Crescent Avenue, Sausalito,
    California, hereinafter the plaintiff.

3.    Defendant Eastern Yacht Sales Inc. is a Rhode Island corporation having its usual place of business at 39 Alexander Road, Portsmouth, Rhode Island 02871; and also having a usual place of business in Massachusetts at 335 Lincoln Street, Hingham, Massachusetts 02043. The resident Massachusetts agent for Eastern Yacht Sales Inc. is Jon F. Rotenberg, presently of 476 Heath Street, Brookline, Norfolk County, Massachusetts 02467. Said defendant is the retail seller of the S/V Phoenix, hereinafter Eastern Yacht Sales.

3(A).    Defendant Eastern Yacht Sales of Rhode Island, Inc. is a Rhode Island corporation having its usual place of business at 39 Alexander Road, Portsmouth, Rhode Island 02871; Said defendant is the retail seller of the S/V Phoenix, hereinafter Eastern Yacht Sales of Rhode Island.

4.    Defendant Jeanneau America Inc. is a corporation presently having a usual place of business at 105 Eastern Avenue, Suite 202, Annapolis, Maryland 21403. Said defendant hereinafter Jeanneau America, is the importer of the vessel from its point of manufacture in the country of France. Jeanneau America is a wholly-owned subsidiary of Chantiers Jeanneau, a French corporation, the manufacturer of the S/V Phoenix.

5.    Defendant Chantiers Jeanneau is a French corporation, the manufacturer of the vessel now known as S/V Phoenix, having its usual place of business at Route De La Roches Suvyon, 85500 Les Herbiers, FRANCE.

## COUNT ONE AGAINST
## MANUFACTURER CHANTIERS JEANNEAU

6.    Plaintiff repeats and re-alleges all of the fact set forth in paragraphs 1-5 hereof and incorporates them herein by reference as if individually set forth herein.

2

7.      From its offices in France, defendant Chantiers Jeanneau is engaged in the manufacture, distribution and/or sales of boats in the United States, including the Commonwealth of Massachusetts and the State of Rhode Island, to the general consuming public.

8.      On or about May 1, 2003, plaintiff agreed to purchase a new Jeanneau 45.2 boat to be designed and manufactured by Chantiers Jeanneau and to be delivered to plaintiff on or about July 2003.

9.      This defendant agreed and warranted expressly and impliedly, to design and manufacture the boat so that it would be safe for the use to which it would be a put, by the plaintiff, and that the boat, as designed and manufactured, would be free of defects in design and workmanship which would affect plaintiff's use and enjoyment of the boat.

10.     Thereafter, this defendant manufactured the subject boat, but did so negligently as hereinafter set forth.

11.     On or about July-August 2003, this defendant delivered the boat from its point of manufacture to the United States distributor/importer, and to the retail boat yard with which plaintiff dealt.

12.     After delivery of the boat, to the boat yard, the vessel was fit-up and made ready for delivery to the plaintiff.

13.     Plaintiff took delivery of the subject vessel on or about August 2003, relying upon the warranty of the defendant that the boat was of merchantable quality, free of defects, and safe for its intended usage; and plaintiff thereafter used the subject boat.

14.   The subject boat was negligently manufactured, was defective when manufactured, and when delivered to plaintiff in that the boat's electrical wiring harness and transmission control cable were negligently designed and installed by this defendant too close together in the engine compartment so that under normal operating and usage conditions the electrical wiring and transmission control cable were in contact with one another causing abrasion and chafing. Defendant's negligence caused this condition and allowed the power lead to the cockpit control panel to come in contact with the steel wire strands of the grounded transmission control cable which could and actually did cause an on-board fire.

15.   As a sole result of the defendant's negligence and the defective condition of the boat aforesaid a devastating fire occurred on board the subject boat on or about December 4, 2003 substantially damaging it and proximately causing plaintiff to sustain a loss.

16.   Plaintiff has given due notice of this breach of warranty to this defendant.

WHEREFORE, plaintiff demands judgment against defendant Chantiers Jeanneau for all their monetary loss and damage and that plaintiff further be awarded interest, costs and attorneys' fees.

### COUNT TWO AGAINST
### IMPORTER/DISTRIBUTOR
### JEANNEAU AMERICA INC.

17.   Plaintiff repeats and re-alleges all of those facts set forth in paragraphs 1-16, hereof and incorporates them herein by reference as if individually set forth herein.

Case 1:04-cv-11071-RCL    Document 32-2    Filed 02/27/05    Page 5 of 10

18.    From its offices in Annapolis, Maryland, this defendant engaged in the business of importing and distributing boats manufactured elsewhere by Chantiers Jeanneau to retail sales outlets in the Commonwealth of Massachusetts, and the State of Rhode Island.

19.    On or about May 1, 2003, plaintiff agreed to purchase a new Jeanneau 45.2 boat to be designed and manufactured by Chantiers Jeanneau in France, and thereafter imported into the United States by this defendant, for sale to the retail outlet, and ultimately for delivery to the plaintiff.

20.    This defendant agreed and warranted expressly and impliedly to import and sell boats which would be and are safe for their intended ordinary use, and which would be and are free from negligence in the design and manufacturing processing and free from defects in design and manufacture which would injure, harm or damage consumers.

21.    This defendant imported the subject boat on or about July-August 2003, and thereafter delivered it to the retail outlet for ultimate sale and delivery to the plaintiff on or about August 2003.

22.    Plaintiff took delivery of the subject boat from the retail outlet on or about August 2003 relying upon the warranty of this defendant that the boat was of merchantible quality, free of defects and safe for its intended use.

23.    Thereafter, plaintiff used the subject boat.

24.    The subject boat was negligently designed and manufactured and was defective when manufactured, when imported, when distributed to the retail outlet and when delivered to plaintiff in that the boat's electrical wiring harness and transmission control cable were negligently designed and installed by entities for whose conduct this defendant is responsible, too close

5

together in the engine compartment so that under normal operating and usage conditions the electrical wiring and transmission control cable were in contact with one another causing abrasion and chafing. This defendant's negligence caused the condition that allowed the power lead to the cockpit control panel to come in contact with the steel wire strands of the grounded transmission control cable which could and actually did cause an on-board fire.

25.   As a sole result of the defendant's negligence and defective condition of the boat aforesaid, a devastating fire occurred on board the subject boat on or about December 4, 2003, substantially damaging it and proximately causing plaintiff to sustain a loss.

26.   Plaintiff has given due notice of this breach of warranty to this defendant.

WHEREFORE, plaintiff demands judgment against defendant Jeanneau America Inc. for all their monetary loss and damage and that plaintiff further be awarded interest, costs and attorneys' fees.

## COUNT THREE AGAINST
## EASTERN YACHT SALES INC.

27.   Plaintiff repeats and re-alleges all of those facts set forth in paragraphs 1-26 hereof and incorporates them herein, by reference as if individually set forth herein.

28.   This defendant was on or about May 1, 2003 and at all other time material hereto, engaged in the business of selling boats to consumers.

29.   This defendant sold and delivered to plaintiff a certain Jeanneau 45.2 boat, manufactured, "fit-up," and distributed by co-defendant's Jeanneau America Inc. and Chantiers Jeanneau.

6

Case 1:04-cv-11007-RCL    Document 13-42    Filed 08/28/05    Page 7 of 10

30.     When purchasing the boat, plaintiff relied upon this defendant's reasonable care and its warranty and the warranties made by the other defendants that the subject boat was merchantible, safe for its intended use and free from defects in its design, manufacture and "fit-up," but in fact it was not. Said boat was not merchantible, was not safe for its intended use and was negligently and defectively designed and manufactured in that the boat's electrical wiring harness and transmission control cable were designed and installed, by entities for whose conduct this defendant is responsible, too close together in the engine compartment so that under normal operating and usage conditions, the electrical wiring and transmission control cable were in contact with one another causing abrasion and chafing. This defendant's negligence caused the condition that allowed the power lead to the cockpit control panel to come in contact with the steel wire strands of the grounded transmission control cable which could and actually did cause an on-board fire.

31.     As a sole result of this defendant's negligence and the defective condition of the boat aforesaid, a devastating fire occurred on board the subject boat on or about December 4, 2003, substantially damaging it and proximately causing plaintiff to sustain a loss.

32.     Plaintiff has given due notice of this breach of warranty to this defendant.

        WHEREFORE, plaintiff demands judgment against defendant Eastern Yacht Sales for all of their monetary loss and damage, and that plaintiff further be awarded interest, costs and attorneys' fees.

## COUNT FOUR: AGAINST EASTERN YACHT SALES OF
## RHODE ISLAND

33.    Plaintiff repeats and re-alleges all of those facts set forth in paragraphs 1-32
       hereof and incorporates them herein by reference as if individually set forth
       herein.

34.    This defendant was on or about May 1, 2003 and at all other time material
       hereto, engaged in the business of selling boats to consumers.

35.    This defendant sold and delivered to plaintiff a certain Jeanneau 45.2 boat,
       manufactured, "fit-up," and distributed by co-defendant's Jeanneau America
       Inc. and Chantiers Jeanneau. This defendant and persons or entities for whose
       conduct this defendant is responsible negligently "fit-up" the boat prior to its
       delivery to the plaintiff.

36.    When purchasing the boat, plaintiff relied upon this defendant's reasonable
       care and the reasonable care of persons or entities for whose conduct this
       defendant is responsible and its warranty and the warranties made by the other
       defendants that the subject boat was merchantible, safe for its intended use
       and free from defects in its design, manufacture and "fit-up," but in fact it was
       not. Said boat was not merchantible, was not safe for its intended use and was
       negligently and defectively designed and manufactured in that the boat's
       electrical wiring harness and transmission control cable were designed and
       installed, by entities for whose conduct this defendant is responsible, too close
       together in the engine compartment so that under normal operating and usage
       conditions, the electrical wiring and transmission control cable were in contact
       with one another causing abrasion and chafing. This defendant's negligence
       and the defective condition allowed the power lead to the cockpit control
       panel to come in contact with the steel wire strands of the grounded

8

transmission control cable which could and actually did cause an on-board fire.

37.    As a sole result of this defendant's negligence and the negligence of persons or entities for whose conduct this defendant is responsible and the defective condition of the boat aforesaid, a devastating fire occurred on board the subject boat on or about December 4, 2003, substantially damaging it and proximately causing plaintiff to sustain a loss.

38.    Plaintiff has given due notice of this breach of warranty to this defendant.

WHEREFORE, plaintiff demands judgment against defendant Eastern Yacht Sales of Rhode Island for all of their monetary loss and damage, and that plaintiff further be awarded interest, costs and attorneys' fees.

## COUNT FIVE: VIOLATION OF MGL CHAPTER 93A AGAINST ALL DEFENDANTS

39.    Plaintiff repeats and re-alleges all of those facts set forth in paragraphs 1-38 hereof and incorporates them herein by reference as if individually set forth herein.

40.    The acts, practices, and conduct aforesaid of these defendants is a willful, knowing, intentional and bad faith violation of MGL Chapter 93A, Sections 1 et seq. which has caused plaintiff to suffer loss and damage.

41.    Plaintiff has given notice to these defendants as required by law, but defendants have failed, neglected and refused to respond to the plaintiff as required by law.

9

WHEREFORE, plaintiff demands judgment against all defendants, jointly and severally, for their actual loss and damage; that multiple damages be awarded to the plaintiff pursuant to MGL Chapter 93A Section 1 et seq.; and that plaintiff recover interest, costs and attorneys' fees, all as provided by law.

Plaintiffs demand a jury trial on all issues so triable.

Plaintiffs
By their attorney

Robert G. Cohen BBO # 090340
188 Oaks Road
Framingham, MA 01702
(508) 875-0035

Dated: September 12, 2005

10



Volume: II
Pages: 1 - 76
Exhibits: 1 - 13

**COPY**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RECEIVED
SEP 29 2005
CLINTON & MUZYKA, P.C.

- - - - - - - - - - - - - - - x
ROBERT L. LUSSIER, ET AL.,

   Plaintiffs,

 VS

EASTERN YACHT SALES, INC.,
JEANNEAU AMERICA INC., and
CHANTIERS JEANNEAU,

   Defendants.
- - - - - - - - - - - - - - - x

DEPOSITION OF RON LUSSIER, a witness

called by counsel for Jeanneau America, Inc.,

taken pursuant to the Massachusetts

Rules of Civil Procedure, before Cheryl A.

Lynch, a Professional Court Reporter and Notary

Public in and for the Commonwealth of

Massachusetts, at the Law Offices of Clarken,

Sawyer & Phillips, 20 William Street,

Wellesley, Massachusetts, on Wednesday,

September 7, 2005, commencing

at 10:20 a.m.

APPEARANCES:


ROBERT G. COHEN, ESQUIRE
188 Oaks Road
Framingham, Massachusetts  01702
Counsel for the Plaintiffs



BAKER, BRAVERMAN & BARBADORO PC
(By: William B. Golden, Attorney at Law)
50 Braintree Hill Park
Braintree, Massachusetts  02184
Counsel for Easter Yacht



FLANAGAN & HUNTER, P.C.
(By: Brian P. Flanagan, Attorney at Law)
88 Black Falcon Avenue, suite 274
Boston, Massachusetts  02210
Counsel for Jeanneau America, Inc.



HODOSH SPINELLA & ANGELONE PC
(By: Thomas C. Angelone, Attorney at Law)
One Turks Head Place, Suite 1050
Providence, Rhode Island 02903
Counsel for Chantiers Jeanneau



CLINTON & MUZYKA
(By: Robert Collins, Attorney at Law)
One Washington Mall
Boston, Massachusetts  02108
Counsel for One Beacon Insurance



DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
ONE STATE STREET, SUITE 1150
BOSTON, MASSACHUSETTS  02109
TEL. NO.  1-617-742-6900

| 1  | A. | Yes, the date this is -- well, this doesn't |
|----|----|---------------------------------------------|
| 2  |    | have a date when it was actually paid, the quote |
| 3  |    | is July, 2003. |
| 4  | Q. | That's 13? |
| 5  | A. | They did do work after we did our trip to Maine, |
| 6  |    | and it might be that this was work that was |
| 7  |    | done after that. |
| 8  | Q. | That would be work that was done directly |
| 9  |    | between Cay and your father? |
| 10 | A. | Yes. |
| 11 | Q. | Now, are you aware of any reports maintaining |
| 12 |    | that it was any work done by Cay Electronics |
| 13 |    | that caused the fire? |
| 14 | A. | No. |
| 15 | Q. | Are you aware of any reports that maintain that |
| 16 |    | it was any work done by Eastern Yacht Sales |
| 17 |    | that caused the fire? |
| 18 | A. | No. |
| 19 | Q. | Were you present at any time when the vessel |
| 20 |    | was grounded? |
| 21 | A. | Grounded as in? |
| 22 | Q. | Well, let me ask you this: are you aware that |
| 23 |    | at least your father had grounded the vessel on |
| 24 |    | several occasions? |



**INTERNATIONAL MARINE UNDERWRITERS**

*The Company issuing this policy is indicated below:*
**OneBeacon America Insurance Company**

*Policy Number*
**C5JH20189**

*Insured*      Eastern Yacht Sales, Inc. etal

*Street*      335 Lincoln St.
*City*         Hingham
*State*        MA          *Zip*          02043-1609

*Renewal of*
**C2JH20189**

*Policy Period*                          12:01 AM
*At place of Issuance from*        *May 23, 2003*    *TO:*    *May 22, 2004*

                                    *Representative:*
                                    *Producer #*       33294

*Producer*    C & L Insurance, Inc.
*Street*      7301 West Palmetto Park Rd. 101C
*City*        Boca Raton
*State*       FL               *Zip*        33433

*NAMED LOCATIONS*

A.  *See Attached Schedule of Locations*          D.
B.                                                 E.
C.                                                 F.

## COVERAGE SECTION

| | | PREMIUM | |
|---|---|---|---|
| Marina Operators Legal Liability | Covered | $46,606.35 | 100% Deposit |
| Protection & Indemnity | Covered | $21,500.00 | |
| Commercial General Liability | Covered | Incl. | |
| Boat Dealer's Insurance | Covered | $32,058.00 | 100% Deposit |
| Piers, Wharves,& Docks Insurance | Not Covered | $0.00 | |
| Property Insurance | Not Covered | $0.00 | |
| Equipment/Tools | Not Covered | $0.00 | |
| Owned Watercraft | Not Covered | $0.00 | |
| Terrorism | Covered | $1,605.00 | |
| Optional Coverage | Not Covered | $0.00 | |

                                    **TOTAL PREMIUM**          $81,769.35
                                    **STATE SURCHARGE**        $0

*For account of themselves*
*Loss, if any payable to:*          *Insured, or order*

*SUBJECT TO CONDITIONS OF FORM ATTACHED HERETO.*
*IMU Manuscript Policy Forms as attached*
*ISO CGL Form CG 00 01 10 01, CG 21 50 09 89*
*CG 04 31 09 98, Endorsement #1-5, CG 21 67 04 02, (2) CG 20 11 11 85*

*LIMITS OF LIABILITY, AMOUNTS OF INSURANCE, AND DEDUCTIBLES AS PER THE DECLARATIONS PAGE*
*THIS POLICY IS MADE AND ACCEPTED SUBJECT TO THE FOREGOING PROVISIONS AND STIPULATIONS AND THOSE*
*HEREINAFTER STATED, WHICH ARE HEREBY MADE A PART OF THIS POLICY TOGETHER WITH OTHER SUCH*
*PROVISIONS, STIPULATIONS AND AGREEMENTS AS MAY BE ADDED HERETO, AS PROVIDED IN THIS POLICY.*

*IN WITNESS WHEREOF, this Company has caused this Policy to be executed below, but this*
*Policy shall not be valid unless countersigned by a duly authorized representative of the Company.*

*Daniel R. Smith*
*Secretary*
*Countersigned by*
*this date*          *May 1, 2003*

*Ray Barrette*
*Managing Director & CEO*

**Authorized Representative**

*Eastern Yacht Sales, Inc. etal*          *Declarations*

*Coverage Section*                                                      *Page 2*

|  |  | Deductible | Limit | Premium |
|---|---|---|---|---|
| **I** | **Marina Operators Legal Liability** I | | | $46,606.35 |
| | A. Any One Vessel | | $500,000 | 100% Deposit |
| | B. Any One Accident or Occurrence | $2,500 | $1,000,000 Receipts, adjustable @ | 2.32% |
| | | | Sales, adjustable @ | 6.285% |
| **II** | **Protection & Indemnity** II | N/A | | $1,500.00 |
| | A. Any One Accident or Occurrence | | $1,000,000 | |
| **III** | **Commercial General Liability** III | N/A | | Included |
| | A. General Aggregate Limit (Other than Products/ Comp Ops) | | $2,000,000 | |
| | B. Products-Completed Operations Aggregate Limit | | $1,000,000 | |
| | C. Personal and Advertising Injury Limit | | $1,000,000 | |
| | D. Each Occurrence Limit | | $1,000,000 | |
| | E. Fire Damage Limit | | $100,000 | |
| | F. Medical Expense Limit | | $5,000 | |
| **IV** | **Boat Dealers Insurance** IV | | | $32,058.00 |
| | A. Any One Vessel | | $650,000 | 100% Deposit |
| | B. Any One Location | | $5,000,000 Reporting Annually @ | |
| | C. Any One Accident or Occurrence | $5,000 | $5,000,000 6.64% | |

**V**  **Piers, Wharves, and Docks**   V          *Valuation-*    *Replacement Cost Co-Insurance 90%*
*Description*                                             *Insured Value* --D/A-- *Rate*

Location A   Not Covered
Location B   Not Covered
Location C   Not Covered
Location D   Not Covered
Location E   Not Covered
Location F   Not Covered

**VI**  **Property Insurance**  *Excl Earthquake*  VI    *Valuation-*   *Replacement Cost Co-Insurance 90%*    PWD Total | $0.00 |

| | *Description* | | *Insured Value* | *Rate* | *Premium* | *Location D/A* | |
|---|---|---|---|---|---|---|---|
| A | Building Not Covered | | Not Covered | | | | |
| | Contents 0 | | | | | | |
| | Business Income & Extra Expense | | Not Covered | | | Location Total | $0.00 |
| B | Building Not Covered | | Not Covered | | | Location D/A | |
| | Contents | | | | | | |
| | Business Income & Extra Expense | | Not Covered | | | Location Total | $0.00 |
| C | Building Not Covered | | Not Covered | | | Location D/A | |
| | Contents | | | | | | |
| | Business Income & Extra Expense | | Not Covered | | | Location Total | $0.00 |
| D | Building Not Covered | | Not Covered | | | Location D/A | |
| | Contents | | | | | | |
| | Business Income & Extra Expense | | Not Covered | | | Location Total | $0.00 |
| | | | | | | Add'l Property | $0.00 |
| | | | | | | Pr Sub Total | $0.00 |

| **Equipment/Tools** | VII | *As per Schedule* | Not Covered |
|---|---|---|---|
| **Owned Watercraft** | VIII | *As per Schedule* | Not Covered |
| Terrorism | IX | | $1,605.00 |
| **Optional Coverage** | X | | Not Covered |

*Grand Total*                     | $81,769.35 |

*Declarations*                                                                                    Page3

### Schedule of Equipment/Tools

*Actual Cash Value - Co-Insurance 80%*

| | Description | Value | D/A | Rate | Premium | Serial Number |
|---|---|---|---|---|---|---|
| 1 | NO EQUIPMENT COVERED | $0 | | | | |
| 2 | | $0 | | 0.00% | $0.00 | |
| 3 | | $0 | | 0.00% | $0.00 | |
| 4 | | $0 | | 0.00% | $0.00 | |
| 5 | | $0 | | 0.00% | $0.00 | |
| 6 | | $0 | | 0.00% | $0.00 | |
| 7 | | $0 | | 0.00% | $0.00 | |
| 8 | | $0 | | 0.00% | $0.00 | |
| 9 | | $0 | | 0.00% | $0.00 | |
| 10 | | $0 | | 0.00% | $0.00 | |

**Total Premium**        $0.00

### Schedule of Owned Watercraft

*Actual Cash Value - Co-Insurance 80%*

| | Description | Value | D/A | Rate | Premium | Serial Number |
|---|---|---|---|---|---|---|
| 1 | 0 | $0 | $0 | 0.00% | $0.00 | |
| 2 | | $0 | | 0.00% | $0.00 | |
| 3 | | $0 | | 0.00% | $0.00 | |
| 4 | | $0 | | 0.00% | $0.00 | |
| 5 | | $0 | | 0.00% | $0.00 | |
| 6 | | $0 | | 0.00% | $0.00 | |
| 7 | | $0 | | 0.00% | $0.00 | |
| 8 | | $0 | | 0.00% | $0.00 | |
| 9 | | $0 | | 0.00% | $0.00 | |
| 10 | | $0 | | 0.00% | $0.00 | |

Eastern Yacht Sales, Inc. etal)

*Declarations*



*Name and Address*

Location

Interest

*Location and Interest*



*Coverage Section(s) Applicable*



*Name and Address*

Location

Interest

*Location and Interest*

*Coverage Section(s) Applicable*



*Name and Address*

Location

Interest

*Location and Interest*

*Coverage Section(s) Applicable*



*Name and Address*

Location

Interest

*Location and Interest*

*Coverage Section(s) Applicable*





*Name and Address*

Location

Interest

*Location and Location and Interest*    Coverage Section(s)



*Coverage Section(s) Applicable*



*Name and Address*

Location

Interest

*Location and Interest*

*Coverage Section(s) Applicable*



*Name and Address*

Location

Interest

*Location and Interest*



*Coverage Section(s) Applicable*



*Name and Address*

Location

*Location and Interest*



*Coverage Section(s) Applicable*



**INTERNATIONAL**
**MARINE** 🔲 ⊠ 🔲
**UNDERWRITERS**

Endorsement No. 1                    OneBeacon America Insurance Company

This Endorsement, effective  5/22/2003    forms a part of Policy No.   C5JH20189
issued to   EASTERN YACHT SALES, INC. etal

# Chemical, Biological, Bio-Chemical, and Electromagnetic Weapon Exclusion

**This Clause shall be paramount and shall override anything contained in this insurance
inconsistent therewith.**

1. In no case shall this insurance cover loss, damage, liability, or expense directly or indirectly
   caused by or contributed to by or arising from

   1.1 Any chemical, biological, bio-chemical or electromagnetic weapon.

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

# AIMU
# EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
# WITH U.S.A. ENDORSEMENT
# (March 1, 2003)

**This clause shall be paramount and shall override anything contained in this insurance
inconsistent therewith.**

1. In no case shall this insurance cover loss, damage, liability, or expense directly or indirectly
   caused by or contributed to by or arising from

   1.1   ionizing radiations from or contamination by radioactivity from any nuclear fuel or
         from any nuclear waste or from the combustion of nuclear fuel

   1.2   the radioactive, toxic, explosive or other hazardous or contaminating properties of
         any nuclear installation, reactor or other nuclear assembly or nuclear component
         thereof

   1.3   any weapon or device employing atomic or nuclear fission and/or fusion or other like
         reaction or radioactive force or matter.

   1.4   the radioactive, toxic, explosive or other hazardous or contaminating properties of
         any radioactive matter.   The exclusion in this sub-clause does not extend to
         radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared,
         carried, stored, or used for commercial, agricultural, medical, scientific or other
         similar peaceful purposes.

**CONTINUED**

Chem-RACE                    A Member of the OneBeacon Insurance Group

RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
(U.S.A. ENDORSEMENT)

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that

if fire is an insured peril

and

where the subject matter is within the U.S.A., its islands, onshore territories or possessions

and

a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

All Other Terms and Conditions Remain Unchanged.

_____
Authorized Representative

Chem-RACE                    A Member of the OneBeacon Insurance Group

ENDORSEMENT #2

to be attached and made part of Policy No.    CZJH20189

of  OneBeacon America  Insurance Company

issued to   EASTERN YACHT SALES, INC. etal

## SCHEDULE OF LOCATIONS

A.  1177 Ave., C.,  Riviera Beach, FL
B.  2550 S. Bayshore Dr.,  Miami, FL
C.  349 Lincoln St.,  Hingham, MA
D.  39 Alexander Rd.,  Portsmith, RI
E.  729 Boylston St.,  Boston, MA 02116
F.  1501 Broadway,  Riviera Beach, FL
G.  1200 sq. ft. Building at 349 Lincoln St.
    Bldg. #11,  Hingham, MA 02043
H. 39 Alexander Rd.,  Portsmith, RI 02871

All other terms and conditions remaining unchanged.

OneBeacon America Insurance Company

ENDORSEMENT #3

to be attached and made part of Policy No.    C5JH20189

of  OneBeacon America Insurance Company

issued to    EASTERN YACHT SALES, INC. etal

## COMPLETE NAMED INSURED

EASTERN YACHT SALES, INC. A DELAWARE CORPORATION
EASTERN YACHT SALES, INC. A FLORIDA CORPORATION
EASTERN YACHT SALES OF RHODE ISLAND, INC. A DELAWARE CORPORATION
EASTERN YACHT SERVICES, INC.

All other terms and conditions remaining unchanged.

OneBeacon America Insurance Company

ENDORSEMENT #4

to be attached and made part of Policy No.    C5JH20189

of  OneBeacon America Insurance Company

issued to    EASTERN YACHT SALES, INC. etal

ADDITIONALINSURED

Hewitts Cove Marina
349 Lincoln St.
Route 3A
Hingham, MA 02043

All other terms and conditions remaining unchanged.

OneBeacon America Insurance Company



**INTERNATIONAL MARINE ☐ ⊠ ☐ UNDERWRITERS**

Endorsement No. 5                    OneBeacon America Insurance Company
Add'l Premium:  $1,605.00
This Endorsement, effective   5/22/2003      forms a part of Policy No.   C5JH20189
issued  to   EASTERN YACHT SALES, INC. etal

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

I. This endorsement modifies insurance provided under the following Coverage Sections:

- Marina Operator's Legal Liability
- Protection and Indemnity
- Commercial General Liability
- Boat Dealer's Insurance
- Piers, Wharves and Docks Insurance
- Business Property Insurance
- Equipment / Tools Insurance
- Owned Watercraft Insurance

With respect to any exclusion of terrorism in the above Coverage Sections or attached to the above Coverage Sections by endorsement, such exclusion does not apply to a "certified act of terrorism".

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

The following definition is added:
1. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in .concurrence with the Secretary of State and Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

a.  The act resulted in aggregate losses in excess of $5 million; and

b.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

NMP-Cert Terr In                    A Member of the OneBeacon Insurance Group

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy.

All Other Terms and Conditions Remain Unchanged.

_____
Authorized Representative



**INTERNATIONAL MARINE ☐ ☒ ☒ UNDERWRITERS**

Endorsement No. 6

This Endorsement, effective   5/22/2003  forms a part of Policy No.   C5JH20189
issued to   EASTERN YACHT SALES, INC. etal

# HIRED AUTO AND NON-OWNED AUTO LIABILITY

This endorsement modifies the insurance provided under **Section III, Commercial General Liability.**

## SCHEDULE

Insurance is provided only with respect to those coverages for which a specific premium charge is shown:

### HIRED AUTO LIABILITY

| State | Estimated Cost of Hire | RATES per $100 | Advance Premium |
|-------|------------------------|----------------|-----------------|
| FL | N/A | N/A | $100.00 |
| RI | N/A | N/A | $ |
| MA | N/A | N/A | $ |
| | | Sub Total | $100.00 |

### NON-OWNED AUTO LIABILITY

| Number of Employees | | Advance Premium |
|---------------------|--|-----------------|
| Flat | | $ 50.00 |
| | Sub Total | $ |
| | Total Advance Premium | $150.00 |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.  HIRED AUTO LIABILITY**
   The insurance provided under COVERAGE A (Section I) applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your employees in the course of your business.

**B.  NON-OWNED AUTO LIABILITY**
   The insurance provided under COVERAGE A (Section I) applies to "bodily injury" or "property damage" arising out of the use of any "non-owned auto" in your business by any person other than you.

**C.  FOR THE PURPOSES OF THESE COVERAGES ONLY**
   1.  Exclusions c, e, g, h, j, k, l, m and n, under COVERAGE A (Section I) are deleted.
   2.  The following exclusions are added:
       There is no coverage for:
       a.  "Bodily Injury" to:
           (1) an employee of the insured arising out of or in the course of employment by the insured; or
           (2) the spouse, child, parent, brother or sister of that employee as a consequence of (1) above.

(1) Whether the insured may be liable as an employer or in any other capacity; and
(2) To any obligation to share damages with or repay someone else who must pay damages because of injury.

This exclusion does not apply to:
(1) Liability assumed by the insured under an "insured contract"; or
(2) "Bodily Injury" arising out of and in the course of domestic employment by the insured unless benefits for such injury are in whole or in part either payable or required to be provided under any workers compensation law.

b. "Property Damage" to:
(1) property owned or being transported by, or rented or loaned to the insured; or
(2) property in the care, custody or control of the insured.

c. Loss or damage caused directly or indirectly by terrorism, including action in hindering or defending against an actual or expected incident of terrorism. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

Terrorism means activities against persons, organizations or property of any nature:
(1) That involve the following or preparation for the following:
   a.  Use or threat of force or violence; or
   b.  Commission or threat of a dangerous act; or
   c.  Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and
(2) When one or both of the following applies:
   a.  The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or
   b.  It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

3. WHO IS AN INSURED (Section II) is replaced by the following:
Each of the following is an insured under this insurance to the extent set forth below:
a. You;
b. Any person using a "hired auto" with your permission;
c. With respect to a "non-owned auto", any partner or executive officer of yours, but only while such "non-owned auto" is being used in your business;
d. Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under a., b., or c. above.

None of the following is an insured:
a. Any person engaged in the business of his or her employer with respect to "bodily injury" to any co-employee of such person injured in the course of employment;
b. Any partner or executive officer with respect to any "auto" owned by such partner or officer or a member of his or her household;
c. Any person while employed in or otherwise engaged in duties in connection with an "auto business" other than an "auto business" you operate;
d. The owner or lessee (of whom you are a sub-lessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or employee of any such owner or lessee;
e. Any person or organization with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

4. The General Aggregate Limit for Coverage A (Section III.2.b.) does not apply, but the Each Occurrence Limit does apply.

5. The Excess Insurance Condition (Section IV.4.b.3.) is replaced by the following:
(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent:
   (a) not subject to Exclusion g. of Coverage A (Section I); or
   (b) covered under the Hired Auto and Non-Owned Auto Liability coverage.

A Member of the ONEBEACON Insurance Group
Includes copyrighted material of Insurance Services Office with its permission

The following additional definitions apply:

"Auto business" means the business or occupation of selling, repairing, servicing, storing or parking "autos".

"Hired auto" means any "auto" you lease, hire, or borrow. This does not include any "auto" you lease, hire, or borrow from any of your employees or members of their households, or from any partner or executive officer of yours.

"Non-owned auto" means any "auto" you do not own, lease, hire or borrow which is used in connection with your business. However, if you are a partnership, a "non-owned auto" does not include any auto owned by any partner.

All Other Terms and Conditions Remain Unchanged.

_____
Authorized Representative

A Member of the ONEBEACON Insurance Group
Includes copyrighted material of Insurance Services Office with its permission.
Copyright, Insurance Service

GENERAL CHANGE ENDORSEMENT

NUMBER __**#7**__

This endorsement, effective _____ **5/22/2003** _____, forms a part of

Policy No. __ **C5JH20189** _____ of the __ **OneBeacon America Insurance Company** __

Issued to __ **EASTERN YACHT SALES, INC. etal** _____

It is agreed that this policy is hereby amended as indicated by (X):

___ Additional premium of $_____ Pro-rata          ___ Return premium of $ _____ Pro-rata

                  $_____ Annual                        $ _____ Annual

___ Amount of insurance increased by $_____     ___ Amount of Insurance reduced by $_____
to a total of $ _____                         to a total of $ _____

___ Item(s) listed below ADDED to schedule        ___ Item(s) listed below DELETED from schedule

___ Name of Insured amended to read as shown below  ___ Address of Insured amended to read as shown
                                                 below.

___ Premium/Rate amended as shown below.          ___ Policy conditions amended as shown below.

___ Description of scheduled item amended as shown  ___ Loss Payee added as shown below.
below.

___ Policy effective/expiration date amended to read as follows:

    from _____ to _____


Revised Declaration Pages attached replace original Declaration Pages

effective _____ **5/22/2003** _____.


**The following Loss Payees are deleted:  Century Bank & Trust Co.
                                     Deutsche Financial Service Corp.
Added as Loss Payee w/ respect to Boat Dealer Ins:
    GE Commercial Distribution Finance
    P.O. Box 740143
    Atlanta, GA 30374**

**Location H is deleted:  39 Alexander Rd.,  Portsmith, RI**

**Location D is amended to read Portsmouth in lieu of Portsmith**

All other terms and conditions remain unchanged.

_____
Authorized Representative

8/5/2003 mjl

# **ational Marina Prog am**

## Introduction

The National Marina Program was developed by International Marine Underwriters for the convenience of the marina operator. The Program is a collection of different kinds of coverage which may be important to the marina operator. By choosing the appropriate Coverage Sections, described below, a marina operator can easily assemble a customized program. The Declarations pages will indicate what kinds of coverages are chosen by the particular marina operator under this Program, together with the limits of liability, deductibles, schedules of property and locations insured under each kind of coverage selected. Only those kinds of coverage specifically chosen by the marina operator, and for which the word "COVERED" is indicated and a premium is shown on page 1 of the Declarations, will be provided under the Program.

The liability coverages available through this Program, at the marina operator's option, are designated herein as the following Coverage Sections:

*I.   Marina Operators Legal Liability*
*II.   Protection and Indemnity*
*III.   Commercial General Liability*

The property coverages available through this Program, also at the marina operator's option, are

*IV.   Boat Dealers Insurance*
*V.   Piers, Wharves, and Docks Insurance*
*VI.   Business Property Insurance*
*VII.   Equipment/Tools Insurance*
*VIII.   Owned Watercraft Insurance*

Each of the Coverage Sections is subject to its own terms, conditions, exclusions and endorsements. These provisions, together with the Declarations for the particular Coverage Section, should be read carefully since they determine rights, duties, limitations and what is and is not covered.

In addition, to the provisions for each Coverage Section, there are General Exclusions from Coverage, applicable to all the Coverage Sections selected. These General Exclusions from Coverage are set forth in the section of this Program designated:

## *IX.   General Exclusions from Coverage (Applicable to all Coverage Sections)*

There are also General Conditions of Coverage, which apply to all the Coverage Sections, in addition to the provisions of each Coverage Section. These General Conditions of Coverage are set forth in the section of this Program designated:

## *X.   General Conditions of Coverage (Applicable to all Coverage Sections)*

The General Exclusions (Section IX) and the General Conditions (Section X) should also be read carefully, since they determine rights, duties, limitations and what is and is not covered with respect to all the Coverage Sections selected under this Program.

**Marina Operators Liability ............ 3**
1. Coverage ......................................... 3
2. Exclusion from Coverage .................... 3
3. Newly Acquired Extension of Cover ...... 4
4. Limited Pollution Coverage ................. 4
**Protection & Indemnity ................. 5**
1. Coverage ......................................... 5
2. Exclusions from Coverage ................... 5
3. Medical Payments ............................. 6
3. Limited Pollution Coverage ................. 6
**Commercial General Liability ........ 8**
1. CGL Clauses .................................... 8
**Boat Dealers ................................. 9**
1. Coverage ......................................... 9
2. Demonstration Warranty ..................... 9
3. Property Covered .............................. 9
4. Property Not Covered ......................... 9
5. Territorial Limits ................................ 9
6. Exclusions from Coverage ................. 10
7. Valuation ....................................... 10
8. Repairs .......................................... 10
9. Carrier or Bailee .............................. 11
10. Unrepaired Damage ......................... 11
11. Abandonment ................................. 11
12. Reporting and Adjustment ................. 11
**Piers, Wharves, & Docks ............. 12**
1. Coverage ....................................... 12
2. Warranty ........................................ 12
3. Exclusion from Coverage: ................. 12
4. Repair Costs ................................... 12
5. Valuation ....................................... 13
6. Total Loss ...................................... 13
7. Replacement Cost Coverage ............. 13
8. Debris Removal ............................... 13
**Property ...................................... 15**
1. Building and Personal Property Clauses ... 15
**Equipment/Tools .......................... 16**
1. Coverage ....................................... 16
2. Property Covered ............................. 16
3. Property Not Covered ....................... 16
4. Territorial Limits .............................. 16
5. Exclusions from Coverage ................. 16
6. Total Loss ...................................... 17
7. Coinsurance ................................... 17
8. Waiver of Depreciation ..................... 17
9. Other Recoveries ............................ 17
10. Company Options ........................... 17
11. Release of Carrier's Liability ............. 17
12. Abandonment ................................. 17
13. Additional Coverages ...................... 17
14. Valuation ....................................... 19

15. Replacement Cost Coverage ............. 19
16. Definitions ..................................... 19
**Owned Watercraft ........................ 20**
1. Coverage ....................................... 20
2. Territorial Limits .............................. 20
3. Warranties ...................................... 20
4. Exclusion from Coverage ................... 20
5. Total Loss ...................................... 21
6. Constructive Total Loss .................... 21
7. Coinsurance ................................... 21
8. Repair Clause ................................. 21
9. Unrepaired Damage ......................... 21
10. Valuation ....................................... 21
11. Replacement Cost Coverage ............. 21
**General Exclusions ....................... 22**
1. Extended Radioactive Contamination
   Exclusion Clause (RACE 3/1/03) ........ 22
2. War Risk Exclusion ........................... 22
3. Chemical, Biological, Bio-Chemical and
   Electromagnetic Weapon Exclusion ... 23
4. Punitive Damages Exclusion ............. 23
5. Absolute Pollution Exclusion ............. 23
6. Absolute Asbestos Exclusion ............. 24
7. Employment Related Practice Excl ..... 25
8. Definitions ...................................... 25
**General Conditions ....................... 26**
1. Insured .......................................... 26
2. Deductible ...................................... 26
3. Limits of Liability ............................. 26
4. Claim Costs and Expenses ................. 26
5. Records and Reports ........................ 27
6. Inspections and Surveys ................... 27
7. Concealment, Misrepresentation or
   Fraud ............................................. 27
8. Notice of Loss ................................. 27
9. Protection of Property and
   Cooperation the Insured .................. 28
10 Payment of Losses ......................... 28
11. Subrogation ................................... 28
12. Impairment of Recovery Rights .......... 28
13. Cancellation .................................. 28
14. Conformity to Statutes ..................... 29
15. Transfer of Legal Rights ................... 29
16. No Benefit to Bailee ........................ 29
17. Other Insurance ............................. 29
18. Changes ........................................ 29
19. Coinsurance ................................... 29
20. Time for Suit .................................. 30
21. Mortgagee and Trustee Interest ........ 30
22. Captions, Titles Clause .................... 31
23. Reporting and Adjustment ................. 31

# CoverageSection I

## *Marina Operators Legal Liability*

### 1. Coverage

Subject to the General Exclusions from Coverage (Section IX) and the General Conditions (Section X), this Coverage Section insures the legal liability of the Insured as a marina operator for loss or damage to boats, engines, trailers and outboard motors, the property of others, which are in its care, custody or control for purposes of repair, storage, mooring, launching, hauling, fueling, docking or other marina operations. We will be liable for covered operations only at the premises described in the Declarations, including adjacent moorings and while watercraft is being shifted or moved overland or water within 100 miles of such premises in connection with covered operations and for property away from your premises in your or your employees' custody for service or repair. Also including the legal liability of the Insured for loss or damage to the property of others caused by said boats, engines, trailers or outboard motors, the property of others, which are in your care, custody or control.

### 2. Exclusion from Coverage

This insurance does not cover any liability:

2.1  For bodily harm, bodily injury, personal injury, or death;

2.2  For demurrage, loss of time, loss of use, loss of freight, loss of charter and/or similar and/or substituted expenses;

2.3  Assumed under contract express or implied;

2.4  For collision liability, tower's liability or liabilities insured against under the customary forms of hull or protection and indemnity policies arising out of the operation of any watercraft owned or operated by or demise chartered to the Insured or any affiliated or subsidiary concern or party;

2.5  For property owned, leased or entrusted to the Insured for sale;

2.6  For the expense of re-doing work improperly performed by or on behalf of the Insured or the cost of replacement of materials, parts, or equipment furnished in connection therewith;

2.7  For the cost or expense of repairing, replacing or renewing any faulty designed part or parts which cause(s) loss of or damage to the watercraft, or for any expenditure incurred by reason of a betterment or alteration in design;

2.8  For the loss or damaged caused by or resulting from the weight of the load exceeding the registered or rated lifting capacity of any lift device, marine railway, dry-dock, or part thereof;

2.9  For any loss or damage unless discovered prior to or within sixty days of the delivery to owner or his agents or within sixty days after the work is completed, whichever may first occur;

2.10 For wrongful conversion by or infidelity of the Insured or his employees or agents.

## 3. Newly Acquired Extension of Coverage

You may extend the insurance that applies to newly acquired locations for 30 days beginning the date you acquire the location.   For coverage after 30 days you must report the location to the Company, have the location endorsed to the policy effective the date you acquired it and pay the appropriate premium.

## 4. Limited Pollution Coverage

It is understood and agreed that the insurance hereunder, subject to all its terms and conditions, including Exclusion No. 4 of the General Exclusions from Coverage (Section IX), is extended to cover any loss, damage, cost, liability or expense to boats, engines, trailers, and outboard motors, the property of others, which are in the Insureds care, custody or control for purposes of repair, storage, mooring, launching, hauling, fueling, docking or other marina operations, that the Insured shall become liable to pay and shall pay in consequence of the actual or potential discharge, emission, seepage, spillage or leakage upon or into the seas, waters, land or air, of smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or nature whatsoever.

Notwithstanding the above or anything contained in this Program, this insurance shall not indemnify the insured for any loss, damage, cost, liability or expense:

4.1 Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage unless caused by fault not constituting willful negligence or willful misconduct within the privity and knowledge of the Insured(s) or his managing officer(s) or managing agent(s);

4.2 Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage into or upon land, the atmosphere or any watercourse, water supply, reservoir or body of water which is not sudden, accidental, unexpected and unintended;

4.3 Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage into or upon land, the atmosphere or any watercourse, water supply, reservoir or body of water, the occurrence of which cannot be identified as commencing at a specific point in time and did not become known to the Insured within 48 hours thereafter;

4.4 Arising out of liability in connection with waste disposal sites and/or the disposal or dumping of any material or waste substance of any nature whatsoever;

4.5 Arising out of fines, penalties or punitive damages resulting from the actual or potential discharge, emission, seepage, spillage or leakage of smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or nature whatsoever.

**Coverage Section II**

## *Protection and Indemnity*

### 1. Coverage

Subject to the General Exclusions from Coverage (Section IX) and the General Conditions of Coverage (Section X), this Coverage Section insures the legal liability of the Insured for the sums the Insured becomes legally liable to pay with respect to:

1.1 Watercraft operated by the Insured or a competent employee in conjunction with normal business operations;

1.2 Watercraft insured under any Coverage Section of this Program which break away from the premises scheduled in the Declarations;

1.3.1 Watercraft owned by the Insured and rented to third parties;

1.3.2 Watercraft at trade and/or exhibition show but only while afloat.

and on account of:

1.4 Loss of life, or bodily injury to any person;

1.5 Loss of or damage to any other vessel;

1.6 Loss of, or damage to, or expense in connection with any fixed or movable object or property of whatsoever nature;

1.7 Cost or expense of, or incidental to, the removal of wreck of the insured watercraft when such removal is compulsory by law;

1.8 Costs and expenses, incurred with underwriter's approval, for investigating and/or defending any claim or suit against the Insured arising out of a liability or an alleged liability of the Insured.

### 2. Exclusions from Coverage

Notwithstanding the above, this policy does not cover:

2.1 Any loss of, or damage to, or expense in connection with, any property owned by, leased to, or rented to, the Insured;

2.2 Any liability, loss, damage or expense arising with respect to loss of life or injury to any employee of the Insured;

2.3 Any liability, loss, damage or expense assumed by the Insured beyond that imposed by law in the absence of contract;

2.4 Any liability, loss, damage, or expense with respect to watercraft while onshore;

2.5 Any liability, loss, damage or expense arising out of jet skiing, waverunners, sea doo's or similar personal watercraft or water skiing or any sport or activity in which objects or persons or both are towed;

2.6 Any liability, loss, damage or expense with respect to rental operations, unless the Insured obtains a signed rental agreement in which the renter holds harmless the Insured and the In-

sured's staff from any liabilities arising from the use of boats and/or equipment;

2.7 Any liability, loss, damage, or expense arising out of swimming, snorkeling, diving, or similar activities;

2.8 Any liability, loss, damage, or expense arising due to the failure of the Insured to have a competent employee of the Insured at all times in charge of any watercraft being navigated for the purpose of demonstration, delivery, or testing;

2.9 Any liability, loss, damage, or expense arising out of an occurrence where the watercraft used by the Insured was not at all times in compliance with the applicable Federal, State, and local rules and regulations, including any such regulation promulgated by the United States Coast Guard.

2.10 It is a condition of this Insurance that there be no coverage whatsoever for any liability, loss or damage when the speed of a vessel exceeds 55 MPH while being operated.

## Additional Coverages

### 3.1 Medical Payments

We will pay to or for each person, excluding the insured or your employees, who sustains bodily injury caused by an "occurrence" during the policy period, the reasonable expenses of necessary medical, surgical, ambulance, hospital and professional nursing services and, in the event of death resulting from such injury, the reasonable funeral expense, all incurred within one year from the date of "occurrence", subject to the following conditions.

Medical Payments shall not apply:

(A) To bodily injury to or death of any person:

    (1) to or for whom benefits are payable under any Worker's Compensation or under the Federal Longshoremen's and Harbor Worker's Compensation Act;

    (2) who is a trespasser in or upon or boarding or leaving any yacht insured hereunder;

    (3) who is your employee while engaged in your employment;

    (4) to liability assumed by you under any contract or agreement;

    (5) while the yacht is being used for purposes other than those allowed under the policy form.

The most the Company will pay under this Additional Coverage for any one "occurrence" is $1,000 per person, $15,000 in the aggregate occurring during each separate 12 month period of this policy, regardless of the number of persons involved or claims made in the "occurrence".

No deductible applies to this Additional Coverage.

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

### 3.2. Limited Pollution Coverage

It is understood and agreed that the insurance hereunder, subject to all its terms and conditions, including Exclusion No. 4 of the General Exclusions from Coverage (Section IX), is extended to cover any loss, damage, cost, liability or expense that the Insured shall become liable to pay and shall pay with respect to watercraft covered under Coverage Section II, Protection and Indemnity, in consequence of the actual or potential discharge, emission, seep-

age, spillage or leakage upon or into the seas, waters, land or air, of smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or nature whatsoever.

Notwithstanding the above or anything contained in this Program, this insurance shall not indemnify the insured for any loss, damage, cost, liability or expense:

3.2.1 Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage unless caused by fault not constituting willful negligence or willful misconduct within the privity and knowledge of the Insured(s) or his managing officer(s) or managing agent(s);

3.2.2 Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage into or upon land, the atmosphere or any watercourse, water supply, reservoir or body of water, which is not sudden, accidental, unexpected and unintended;

3.2.3 Arising out of an actual or potential discharge, emission, seepage, spillage, or leakage into or upon land, the atmosphere or any watercourse, water supply, reservoir or body of water, the occurrence of which cannot be identified as commencing at a specific point in time and did not become known to the Insured within 48 hours thereafter;

3.2.4 Arising out of liability in connection with waste disposal sites and/or the disposal or dumping of any material or waste substance of any nature whatsoever;

3.2.5 Arising out of fines, penalties or punitive damages resulting from the actual or potential discharge, emission, seepage, spillage or leakage of smoke, vapor, soot, fumes, acids, alkalis, oil,

fuel, cargo, petroleum products, chemicals or other substances of any kind or nature whatsoever.

# Coverage Section III

## _Commercial General Liability_

### 1. CGL Clauses

1.1  Subject to the General Exclusions from Coverage (Section IX) and the General Conditions to Coverage (Section X), the standard form CGL Clauses (Insurance Services Office Form CG 00 01), as appended, is incorporated herein and shall be effective as shown in the Declarations for this Coverage Section.

1.2  In the event the forms incorporated herein under 1.1 differ from the General Conditions to Coverage (Section X), the forms herein shall be considered paramount and shall override anything to the contrary in the General Conditions to Coverage (Section X).

## Coverage Section IV

## *Boat Dealers Insurance*

### 1. Coverage

Subject to the General Exclusions from Coverage (Section IX) and the General Conditions to Coverage (Section X), this Coverage Section insures against all risks of direct physical loss of, or damage to, the property described below from any external cause, except as provided in the Exclusions hereto.

### 2. Demonstration Warranty

Whenever a private pleasure boat insured under this Coverage Section is being navigated by the Insured for the purpose of demonstration, delivery or testing, it is warranted that this Coverage Section shall be void unless:

2.1   The Insured or a competent employee of the Insured is at all times in charge of navigation.

2.2   The private pleasure boat being demonstrated, delivered or tested by the Insured is at all times in compliance with the Federal, State and local rules and regulations.

### 3. Property Covered

This insurance covers all private pleasure boats, boat trailers, marine engines, marine supplies, accessories and parts owned by the Insured and held for sale, consigned to the Insured for sale or sold but not delivered, the title of which is held by others and for which the Insured may be liable.

### 4. Property Not Covered

The coverage provided hereunder shall not apply:

4.1   To property in the course of manufacture.

4.2   To property held by the Insured for purposes of storage or repair.

4.3   While any vessel is being navigated other than for the purpose of demonstration, delivery, or testing.

4.4   To property leased to others or sold by the Insured under an installment plan, conditional sale, mortgage or similar arrangement.

### 5. Territorial Limits

This insurance covers the insured's interest in the property insured hereunder:

5.1   At the premises of the Insured indicated in the Declarations, in transit to or from the premises of the Insured indicated in the Declarations by common carrier or the Insured's own conveyance within the United States or Canada, including while on the premises of the manufacturer from the time title has passed to the Insured if this occurs prior to the time the property actually leaves the premises of the manufacturer.

5.2   While navigating or laid up afloat within 500 miles of the premises indicated in the Declarations.

5.3  While at any trade and/or exhibition show within 500 miles of the premises indicated in the Declarations.

5.4  At any location, except fairs and exhibitions, you acquire up to 25% of the Any One Location Limit shown in the Declarations, but not to exceed $50,000, whichever is less, at each newly acquired location.

## 6. Exclusions from Coverage

This insurance does not apply to loss, damage, liability or expense directly or indirectly caused by, contributed to or resulting from:

6.1  Delay, loss of market, indirect or consequential loss of any kind;

6.2  Loss or damage caused by or resulting from corrosion, rust, dampness of atmosphere, freezing or extremes of temperature;

6.3  Loss, damage or expense caused by or resulting from wear and tear, mechanical breakdown, inherent vice, latent defect, gradual deterioration or depreciation, marine borers, moths, vermin, or by processing of any work upon the property;

6.4  Unexplained loss, mysterious disappearance or loss or shortage disclosed during the taking of inventory.

6.5  Misappropriation, secretion, conversion, infidelity or any dishonest act on the part of the Insured or its employees or others to whom the property may be entrusted (carriers for hire excepted) whether or not such act or acts occurred during the regular hours of employment;

6.6  Any liability assumed under contract or otherwise in extension of the liability imposed upon the Insured by law;

6.7  Loss or damage to electrical appliances or devices of any kind, including wiring, arising from electrical disturbance to the said electrical appliances or devices or wiring from artificial causes, unless fire ensues and then only for direct loss or damage caused by such ensuing fire.

## 7. Valuation

The property insured under this Coverage Section shall be valued as follows:

7.1  New Property - The amount of the invoice to the insured plus freight charges if not included in the invoice and preparation cost actually incurred;

7.2  Used Property - The actual cost to the Insured either though outright purchase or as an allowance for trade in, plus the cost of any work done by the Insured;

7.3  Property of Customers - The actual cash value at the time of loss or damage.

7.4  Property Sold but Not Delivered – Selling price less discounts and expenses that would have otherwise been incurred.

The Company's liability shall be limited to the cost and expense of repairing or replacing any damaged part or parts, including forwarding charges, labor and installation charges necessarily and reasonably incurred to repair or restore the damaged property to its original condition, but not in excess of the above valuation nor in excess of the cost to replace the property, whichever is the lesser.

## 8. Repairs

In the event of claims, cost of repairs to be paid without deduction, "New for Old". However, the Insured specifically

agrees that in respect to loss or damage to:

**8.1** The canvas outfit and all sail(s), if covered hereunder, adjustment shall be made on the basis of the actual cash value at the time of loss or damage.

**8.2** Any plywood, metal, plastic or fiberglass portions of the Boat, this Company shall not be liable for more than:

**8.2.1** The cost of making the repairs in accordance with the customary and generally accepted repair practices; or

**8.2.2** An amount not exceeding the cost of making repairs in accordance with any specific and recommended repair specifications of the Manufacturers of the Boat, whichever is the least amount. This principle shall also govern in determining whether or not the Boat is a constructive total loss.

### 9. Carrier or Bailee

The Insured by acceptance of this insurance, warrants and agrees that no special agreement will be made releasing or limiting the liability of any carrier or bailee. However, privilege is hereby granted the Insured to accept Ordinary Bills of Lading or Receipts issued by the Carrier, but it is agreed that the Insured shall not enter into any special agreement releasing the Carrier from its Common Law or Statutory liability.

### 10. Unrepaired Damage

In no case shall this Company be liable for unrepaired damage in addition to a subsequent total loss sustained during the period of this policy.

### 11. Abandonment

It is understood and agreed that no acts of the Company or the Insured in recovering, saving, or preserving the property insured shall be considered a waiver or an acceptance of abandonment.

### 12. Reporting and Adjustment

Insurance under this section of the policy is subject to the deposit indicated in the Declarations, and to an annual or monthly adjustment of the earned premium at the rates shown.

The Insured shall report to the Company, or its Agent, within 30 days following the expiry or cancellation of this insurance, a accurate statement of:

**12.1** Average monthly inventory of boats and other covered property on land, and,

**12.2** Average monthly inventory of boats and other covered property in water.

If at the time of loss the Assured has failed to render such report as required herein, the Company shall not be liable for more than the amount last reported but in no event shall the liability hereunder exceed that proportion of such loss which the total value last reported bears to the total value actually at risk at the time of such report.

The earned premium shall be calculated by applying the figures reported above to the rates indicated in the Declarations. If the earned premium is less than the deposit premium, and the coverage section is not subject to a minimum premium, the difference shall be refunded to the Insured. If the earned premium exceeds the deposit premium, the amount of such excess shall be paid by the Insured to the Company as an additional premium at the time of filing the report on which the earned premium is due.

# Coverage Section V

## *Piers, Wharves, and Docks*

### 1. Coverage

Subject to the General Exclusions from (Section IX) and the General Conditions to Coverage (Section X) this Coverage Section insures your piers, wharves and docks, floats, platforms, gangplanks, pilings, walkways, wiring, appurtenant plumbing and all other property permanently attached thereon, including roofs or coverings, as described in the Declarations for this Coverage Section against all risks of direct physical loss of, or damage to, the property insured from any external cause, except as provided in the Exclusions hereto.

### 2. Warranty

This insurance shall be void unless:

The character of the insured property, its design and construction, shall remain materially the same during the term of this insurance; conditioned upon immediate written notice to this Company, temporary alterations or changes which are incidental to the performance of necessary repairs shall not constitute a breach of this warranty.

### 3. Exclusion from Coverage:

This insurance does not apply to loss, damage, liability or expense directly or indirectly caused by or contributed to or resulting from:

3.1   Vermin, insects, mold, marine life, weathering, wear and tear, gradual deterioration, latent defect, inherent vice, mechanical breakdown or faulty manufacture;

3.2   Any process of refinishing, renovating or repairing;

3.3   Misappropriation, secretion, conversion, infidelity or any dishonest act on the part of the Insured or other party of interest, his or their employees or agents, or others to whom the property may be entrusted.

3.4 Electricity other than lightning unless fire ensues and then only for loss or damage by such ensuing fire.

3.5   Freezing, ice damage or collapse from the weight of ice or snow.

3.6 Stranding, meaning contact of the floating marinas and/or floating docks or any part thereof with the bottom or sides of the body of water or any object in or protruding therefrom as a direct result of insufficient depth of water to maintain the floating marinas and/or floating docks in a floating condition.

### 4. Repair Costs

It shall be the option of the Company to take possession of any material for the loss of which has been replaced by new material at the expense of the Company, and also to repair, rebuild or replace any property lost or damaged with another of like kind and quality within a reasonable time, on giving of its inten-

tion to do so within thirty (30) days after the receipt of the proof of loss herein required; there can be no abandonment to the Company of any property insured under this Coverage Section.

## 5. Valuation

The Company shall not be liable for more than its proportion of the actual cash value of the property damaged or lost at the time any loss or damage occurs, and shall in no event exceed what it would cost to repair or replace the same with material of like kind and quality. In no event shall the Company be liable for any increase in cost of repairs or reconstruction by any law, ordinance, regulation, permit or license regulating construction or repair.

## 6. Total Loss

The most the Company will pay for loss or damage to the insured property is the insured value indicated on the schedule of property in the Declarations for this Coverage Section.

## 7. Replacement Cost Coverage

If indicated in the Declarations, replacement cost (without deduction for depreciation) replaces actual cash value in the Valuation Clause.

7.1  We will not pay on a replacement cost basis for any loss or damage:

    7.1.1  Until the lost or damaged property is actually repaired or replaced; and

    7.1.2  Unless the repairs or replacement are made as soon as possible after the loss or damage.

7.2  We will not pay more for loss or damage on a replacement cost basis than the least of:

    7.2.1  The insured value applicable to the lost or damaged property;

    7.2.2  The cost to replace, on the same premises, the lost or damaged property with other property:

        7.2.2.1  Of comparable material and quality; and

        7.2.2.2  Used for the same purpose; or

7.3  The amount you actually spent that is necessary to repair or replace the lost or damaged property.

## 8. Debris Removal

8.1  We will pay your expense to remove debris of Covered Property described in the Declarations caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expense will be paid only if they are reported to us in writing within 180 days of the earlier of:

    8.1.1  The date of direct physical loss or damage; or

    8.1.2  The end of the policy period.

8.2  The most we will pay under this Additional Coverage is 10% of the Insured Value or $50,000, whichever is less.

8.3  This Additional Coverage does not apply to costs to:

    8.3.1  Extract "pollutants" from land or water; or

    8.3.2  Remove, restore or replace polluted land or water.

8.4  "Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

# Coverage Section VI

## _Business Property Insurance_

### 1. Building and Personal Property Clauses

1.1   Subject to the General Exclusions from Coverage (Section IX) and the General Conditions (Section X), the standard form Building and Personal Property Clauses (Insurance Services Office Form CP 00 10), Causes of Loss - Special Form (I.S.O. Form CP 10 30), Commercial Property Coverage Endorsement (CU Form G12226), Commercial Property Coverage Endorsement Extensions Endorsement (CU Form G12227), the Commercial Property Conditions (I.S.O. Form CP 00 90), and if applicable, the Earthquake Form (I.S.O.Form CP 1040), the Business Income Coverage Form (I.S.O. Form CP 00 30) which if attached shall be deemed to include "Rental Value," as appended, are incorporated herein and shall be effective as shown in the Declarations for this Coverage Section.

1.2   In the event the forms incorporated herein under 1.1 differ from the General Conditions to Coverage (Section X), the forms incorporated herein shall be considered paramount and shall override anything to the contrary in the General Conditions to Coverage (Section X).

## Coverage Section VII

# *Equipment/Tools Coverage*

## 1. Coverage

Subject to the General Exclusions from Coverage (Section IX) and the General Conditions (Section X), this Coverage Section insures against all risks of direct physical "loss" of, or damage to, the covered property described below from any external cause, except as provided in the Exclusions hereto.

## 2. Property Covered

This insurance covers the scheduled property of the Insured as shown in the Declarations for this Coverage Section and the equipment and tools of others for which the Insured may be liable. Coverage for owned property is provided in consideration of the premium indicated on the schedule of equipment in the Declaration for this Coverage Section.

## 3. Property Not Covered

The coverage provided hereunder does not apply to:

3.1   Vehicles designed and principally used for highway transportation;

3.2   Aircraft or watercraft;

3.3   Property while airborne;

3.4   Property you have loaned, rented, or leased to others;

3.5   Property while located below the surface of the ground;

3.6   Contraband, or property in the course of illegal transportation or trade.

## 4. Territorial Limits

This insurance covers the property insured hereunder while at the locations named in the Declarations, or the premises of others, or while in transit to or from such locations in conjunction with the Insured's normal business operations.

## 5. Exclusions from Coverage

This insurance does not apply to loss, damage, liability or expense directly or indirectly caused by, or contributed to or resulting from:

5.1   Wear and tear, gradual deterioration, rust, corrosion, dampness of atmosphere, freezing or extremes of temperature;

5.2   An original defect in the property;

5.3   Mechanical or electrical breakdown or failure;

5.4   The weight of a load exceeding the manufacturer's rated lifting capacity;

5.5   Any unexplained loss or shortage disclosed upon taking inventory;

5.6   Infidelity or any dishonest act on the part of the Insured, its employees, or

agents, or any person or persons to whom the property insured may be entrusted (carriers for hire excepted);

5.7  Artificially generated currents in the electrical equipment unless fire or explosion ensues and then only for the loss or damage caused by the ensuing fire or explosion;

5.8  An unexplained disappearance.

## 6. Total Loss

The most the Company will pay for loss or damage to the insured property is the insured value indicated on the schedule of equipment or the amount specified under the  Additional Coverages hereto.

## 7. Coinsurance

At the time of loss, the limit of insurance for items scheduled in the Declarations must be insured for their total value.

If not insured for their total value, we will pay only the proportion of any "loss" that the limit of insurance bears to the total value of the scheduled item.

## 8. Waiver of Depreciation

No deduction for depreciation shall be taken on the adjustment of any covered partial loss or damage that does not exceed 20% of the actual cash value of the item described in Declarations.

## 9. Other Recoveries

This Company shall not be liable for any part of loss or damage which has been paid or made good by others.

## 10. Company Options

The Company has the option to:

10.1  Take all or any part of the damaged property at an agreed amount;
10.2  Repair, rebuild or replace it with similar property.

This Company will tell the Insured what the Company will do within 30 days after it has received a signed, sworn statement of loss.

## 11. Release of Carrier's Liability

The Insured by acceptance of this insurance, warrants and agrees that no special agreement will be made releasing or limiting the liability of any carrier or bailee. However, privilege is hereby granted the Insured to accept Ordinary Bills of Lading or Receipts issued by the Carrier, but it is  agreed that the Insured shall not enter into any special agreement releasing the Carrier from its Common Law or Statutory liability.

## 12. Abandonment

It is understood and agreed that no acts of the Company or the Insured in recovering, saving, or preserving the property insured shall be considered an acceptance of abandonment.

## 13. Additional Coverages

13.1  Automatic Coverage for Newly Acquired Property

If, during the term of this Coverage Section, the Insured purchases property similar to the equipment described in Declarations, the Company will automatically cover this equipment for a period of 60 days.

The most the Company will pay in any one loss is the lesser of:

13.1.1  30% of the total limits of Insurance shown in the Declarations; or

13.1.2  $250,000

The Insured agrees to report property within 60 days from the date the property is acquired and to pay any additional premium due. If the Insured does not report such property, coverage will cease automatically 60 days after the date the property is acquired.

**13.2  Automatic Coverage for Borrowed, Rented, or Leased Equipment**

If during the term of this Coverage Section, the Insured borrows, rents or leases property from others similar to the equipment described in the Declarations, the Company will automatically cover this equipment for a period of 45 days.

The most the Company will pay in any one loss is the lesser of:

13.2.1  30% of the total limits of Insurance shown in the Declarations; or

13.2.2  $100,000

The Insured agrees to report property within 45 days from the date the property is acquired and to pay any additional premium due. If the Insured does not report such property, coverage will cease automatically 45 days after the date the property is borrowed, rented, or leased.

**13.3  Limited Pollutant Clean Up and Removal**

Subject to all the terms and conditions of this insurance, including Exclusion No. 4 of the General Exclusions from Coverage (Section IX), it is understood and agreed that this Coverage Section is extended to pay the Insured's expense to extract "pollutants" from land or water at the described premises if the discharge or dispersal of the "pollutants" is caused by or results from a covered loss to the equipment/tools insured hereunder that occurs during this policy period. The expenses will be paid only if they are reported to the Company in writing within 180 days of the earlier of:

13.3.1  The date of direct physical loss; or

13.3.2  The end of the policy period.

The most the Company will pay under this Additional Coverage is $15,000 for the sum of all such expenses arising out of a covered loss to the equipment/tools insured hereunder occurring during each separate 12 month period of this policy.

**13.4  Fire Department Service Charge**

When the fire department is called to save or protect insured property from a covered loss to the equipment/tools insured hereunder, the Company will pay up to $2,500 for the insured's liability for fire department service charges:

13.4.1  Assumed under contract or agreement prior to loss; or

13.4.2  Required by local ordinance.

No deductible applies to this additional coverage.

**13.5  Rental Reimbursement**

The Company will pay the Insured's expense to rent equipment when the rental is made necessary by:

13.5.1 A covered "loss" to equipment scheduled in the Declarations; and

13.5.2 Such equipment is needed to continue normal operations; and

13.5.3 You do not have substitute equipment.

The most the Company will pay for "loss" under this Additional Coverage is $5,000 beginning forty-eight hours after the loss or damage has occurred and ending when the property has been replaced, repaired, or when the need no longer exists, whichever occurs first.

13.6 Preservation of Property

If it is necessary to move insured property to preserve it from "loss" covered by this Coverage Section, the Company will pay the actual expense to move the property to safety.

The Company will also pay any necessary rental fees for the temporary storage at premises of others for a period of 10 days after the property has arrived at such temporary location.

The most the Company will pay under this extension is $5,000. No deductible applies to this extension.

## 14. Valuation

The Company shall not be liable for more than its proportion of the actual cash value of the property damaged or lost at the time any loss or damage occurs, and shall in no event exceed what it would cost to repair or replace the same with material of like kind and quality. In no event shall the Company be liable for any increase in cost of repairs or reconstruction by any law, ordinance, regulation, permit or license regulating construction or repair.

## 15. Replacement Cost Coverage

If indicated in the Declarations, replacement cost (without deduction for depreciation) replaces actual cash value in the Valuation Clause.

15.1 We will not pay on a replacement cost basis for any loss or damage:

15.1.1 Until the lost or damaged property is actually repaired or replaced; and

15.1.2 Unless the repairs or replacement are made as soon as possible after the loss or damage.

15.2 We will not pay more for loss or damage on a replacement cost basis than the least of:

15.2.1 The insured value applicable to the lost or damaged property;

15.2.2 The cost to replace, on the same premises, the lost or damaged property with other property;

15.2.2.1 Of comparable material and quality, and

15.2.2.2 Used for the same purpose; or

15.3 The amount you actually spent that is necessary to repair or replace the lost or damaged property.

## 16. Definitions

"Loss" means direct and accidental loss or damage.

"Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

# Coverage Section VIII

## *Owned Watercraft Insurance*

### 1. Coverage

Subject to the General Exclusions from Coverage (Section IX) and the General Conditions to Coverage (Section X), this Coverage Section insures the watercraft described in the Declarations for this Coverage Section against all risks of direct physical loss of, or damage to, the watercraft insured from any external cause, except as provided in the Exclusions hereto.

### 2. Territorial Limits

This insurance covers the watercraft insured hereunder:

2.1  While at the insured locations, including adjacent mooring;

2.2  While being navigated on water under its own power and while confined to coastal waters not more than twenty-five (25) miles from the nearest coastal shoreline and inland waters of the United States, the District of Columbia and Canada;

2.3  While in due course of transit within the United States, the District of Columbia, and Canada.

### 3. Warranties

This insurance shall be void unless:

3.1  The watercraft insured are maintained by the Insured in a seaworthy condition at all times during the term of this insurance.

3.2  The watercraft insured are operated by duly qualified persons, as required by federal, state or local regulation.

### 4. Exclusion from Coverage

This insurance does not apply to loss, damage, expense directly or indirectly cause by contributed to or resulting from:

4.1  Wear and tear, gradual deterioration, inherent vice, marine borer damage or, vermin damage;

4.2  An original defect in the property;

4.3  Caused by theft or mysterious disappearance of any part of the insured property unless occurring in conjunction with theft of the entire watercraft or unless there be visible evidence of forced entry.

4.4  Rust, corrosion, dampness of atmosphere, freezing or extremes of temperature;

4.5  Unexplained disappearance;

4.6  Artificially generated current creating a short circuit or other electrical disturbance within an article covered under this section;

4.7  Your neglect to use all reasonable means to save and preserve the property at and after any loss or when the property is so endangered.

## 5. Total Loss

The most that this Company will pay for loss of or damage to any one watercraft insured is the value of the watercraft indicated in the Declarations for this Coverage Section, less the deductible shown in the Declarations for this Coverage Section.

## 6. Constructive Total Loss

The watercraft shall not be considered a total or constructive loss unless:

6.1  The watercraft is lost with no reasonable means of recovery; or

6.2  The expense of recovering and repairing the watercraft exceeds the valuation stated in the Declarations.

## 7. Coinsurance

At the time of loss, the limit of insurance for items scheduled in the Declarations must be insured for their total value.

If not insured for their total value, we will pay only the proportion of any loss that the limit of insurance bears to the total value of the scheduled item.

## 8. Repair Clause

Repairs to plywood, fiberglass, plastic, metal or other synthetic material shall be made by applying suitable patches in accordance with good repair practice, to the damaged area.

## 9. Unrepaired Damage

We will not pay for unrepaired damage in addition to a subsequent total loss sustained during the term of this insurance.

## 10. Valuation

The Company shall not be liable for more than its proportion of the actual cash value of the property damaged or lost at the time any loss or damage occurs, and shall in no event exceed what it would cost to repair or replace the same with material of like kind and quality. In no event shall the Company be liable for any increase in cost of repairs or reconstruction by any law, ordinance, regulation, permit or license regulating construction or repair.

## 11. Replacement Cost Coverage

If indicated in the Declarations, replacement cost (without deduction for depreciation) replaces actual cash value in the Valuation Clause.

11.1  We will not pay on a replacement cost basis for any loss or damage:

11.1.1  Until the lost or damaged property is actually repaired or replaced; and

11.1.2  Unless the repairs or replacement are made as soon as possible after the loss or damage.

11.2  We will not pay more for loss or damage on a replacement cost basis than the least of:

11.2.1  The insured value applicable to the lost or damaged property;

11.2.2  The cost to replace, on the same premises, the lost or damaged property with other property:

11.2.2.1 Of comparable material and quality; and

11.2.2.2 Used for the same purpose; or

11.3  The amount you actually spent that is necessary to repair or replace the lost or damaged property.

# Section IX

## *General Exclusions from Coverage*
## *Applicable to All Coverage Sections*

Notwithstanding anything to the contrary provided for in any of the Coverage Sections or the General Conditions to Coverage of this Program, the following exclusions from coverage shall be considered paramount and shall override anything stated to the contrary in any of the Coverage Sections and in the General Conditions to Coverage.

### 1. Extended Radioactive Contamination Exclusion Clause (RACE March 1, 2003)

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from:

1.1 Ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel;

1.2 The radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof;

1.3 Any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

1.4 the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (3/1/03) provided that:

If fire is an insured peril, and, where the subject matter is within the USA, its islands, onshore territories or possessions, and, a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2 and 1.4 of the Extended Radioactive Contamination Exclusion Clause 3/1/03, any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss, damage, liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

### 2. War Risk Exclusion

This insurance does not apply to loss, damage, liability or expense directly or indirectly caused by, contributed to or resulting from:

2.1 Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack:

2.1.1 By any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or

2.1.2 By military, naval or air forces; or

2.1.3 By an agent of any such government, power, authority or forces, except when such agent is acting secretly and not in connection with any operation of armed forces (whether military, naval or air forces) in the country where the property is situated.

2.2   Any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

2.3 Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority;

## 3. Chemical, Biological, Bio-Chemical and Electromagnetic Weapon Exclusion

This insurance does not apply to loss, damage, liability or expense directly or indirectly caused by, or contributed to or resulting from any chemical, biological, bio-chemical or electromagnetic weapon.

## 4. Punitive Damages Exclusion

This insurance does not apply to loss, damage, liability or expense directly or indirectly imposed on the insured as punitive or exemplary damages, how-

ever described and under whatever circumstances.

## 5. Absolute Pollution Exclusion

5.1   This insurance does not apply to any loss, damage, liability or expense that the insured shall become liable to pay and shall pay for "bodily injury", or "property damage" directly or indirectly arising out of, contributed to or resulting from the actual, alleged or threatened "release" of "pollutants" into or upon land,   the atmosphere or any watercourse, water supply reservoir or body of water.

It is further agreed that the intent and effect of this exclusion is to delete from any and all coverages afforded by this insurance (except as provided in 5.3 below) any "occurrence", claim, suit, cause of action, liability, settlement, judgment, defense costs or expenses in any way arising out of such "release" whether or not such "release" arises out of the activities of the Insured or the activities of others and whether or not such "release" is sudden or gradual and whether or not such "release" is expected, intended, foreseeable, fortuitous, accidental or inevitable, and wherever such "release" occurs.

5.2  It is hereby agreed that this insurance shall not apply to:

5.2.1   "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

5.2.1.1   At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

5.2.1.2   At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

5.2.1.3   Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the Insured or any person or organization for whom you may be legally responsible; or

5.2.1.4   At or from any premises or site or location on which any insured or any contractors or subcontractors working directly or indirectly on any Insured's behalf are performing operations:

5.2.1.4.1   If the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

5.2.1.4.2   If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants:"

5.2.1.4.3   Arising from products manufactured, sold, handled or distributed by or on behalf of the Insured.

5.2.1.4.4   Arising from operations completed by or on behalf of the Insured.

5.2.2   Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

5.2.3   Any loss, cost or expense arising out of any claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

5.3   This exclusion applies to all Coverage Sections; however, Coverage Sections I, II, VI and VII contain provisions which shall be construed as additional to the terms of this exclusion.

## 6. Absolute Asbestos Exclusion

This insurance does not apply to loss, damage, liability, or expense (including "bodily injury," "property damage," "personal injury" or "advertising injury" as defined in Coverage Section III) arising out of or caused by:

6.1   Asbestos, asbestos fibers or products containing asbestos or to any obligation of the Insured to indemnify or contribute with another because of damages arising out of such injury or damage; or

6.2   Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection therewith;

6.3   It is further agreed that the Company shall have no duty or obligation to provide or pay for the investigation or defense of any loss, cost, expense, claim or suit excluded herein.

## *Employment Related Practices Exclusion*

This insurance does not apply to:

7.1 "Bodily Injury" and/or "Personal Injury" and/or "Advertising Injury" (as defined in Coverage Section III) to:

    7.1.1 A person arising out of any:

        7.1.1.1 Refusal to employ that person.

        7.1.1.2 Termination of that person's employment; or

        7.1.1.3 Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, employment references, negligent hiring, defamation, harassment, humiliation or discrimination directed at that person; or

7.2 The spouse, child, parent, brother or sister of that person as a consequence of bodily injury and/or personal injury and/or advertising injury to that person at whom any of the employment-related practices described in paragraphs 7.1.1.1, 7.1.1.2 or 7.1.1.3 above is directed.

7.3 This exclusion applies:

    7.3.1 Whether the insured may be liable as an employer or in any other capacity

    7.3.2 To any obligation to share damages with or repay someone else who must pay damages because of the injury.

## 8. Definitions

"Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

"Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, oil, fuel, cargo, petroleum products, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

"Property Damage" means :

A. Physical injury to tangible property, including all resulting use of that property. All such use shall be deemed to occur at the time of the physical injury that caused it; or

B. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

"Release" means discharge, dispersal, seepage, release or escape of "pollutants".

# Section X

## *General Conditions for Coverage Applicable to All Coverage Sections*

The following conditions to coverage apply to all Coverage Sections of this insurance program, including endorsements.

### 1. Insured

With respect to the insurance provided hereunder, the unqualified word "Insured" includes the Named Insured, provided that (1) if the Named Insured is designated as individual, the insurance applies only to the conduct of a business of which he is a sole proprietor, (2) if the Named Insured is or includes a partnership or joint venture, any partner or member thereof but only in respect to his liability as such, and (3) the employees of the Insured acting within the scope of their duties and, in the course of their employment.

This insurance applies separately to each Insured against whom claim is made or suit is brought, but the inclusion herein of more than one Insured shall not operate to increase the applicable limit of this Company's liability.

### 2. Deductible

2.1  This insurance will not pay for loss or damage in any one "occurrence" until the amount of loss or damage exceeds the applicable deductible shown in the Declarations.  This insurance will then pay for the loss or damage in excess of the deductible, up to the applicable limit of insurance shown in the Declarations. One "occurrence" means an accident, including continuous or repeated expo-

sure to substantially the same general harmful conditions.

2.2  No deductible applies to Coverage Section II or Section III.

### 3. Limits of Liability

3.1  The Limits of the Liability of this Company are the insurance limits stated in the Declarations for each Coverage Section. The limits include all loss, damage and expenses which arise out of one occurrence.

3.2  The Company's liability with respect to all loss, damage or expenses which arise out of any one accident or occurrence shall not exceed the limit indicated in the Declarations regardless of how many separate injuries or claims arise out of such accident or occurrence.

### 4. Claim Costs and Expenses

The cost of defending any suit against the Insured on any claim based on a liability or an alleged liability of the Insured covered by any of the liability Coverage Sections, shall be payable by this insurance if the amount of the claim hereunder exceeds the amount of the deductible shown in the Declarations, but this insurance shall not be liable for the cost or expense of prosecuting or defending any suit unless the same shall have been incurred with the written consent of this Company.  This Company, however, reserves the right of naming attorneys who shall represent

the Insured in prosecution or defense of any litigation or negotiations between the Insured and third parties concerning any claim covered by this policy, and shall have the direction of such litigation or negotiations. If the Insured shall fail or refuse to settle any claim as authorized by this Company, the liability of this Company shall be limited to the amount for which settlement could have been made. The right and duty to defend end when the applicable limits of insurance shown in the Declarations has been exhausted in the payment of judgments and/or settlements and/or claim costs and expenses under the relevant Coverage Section; the costs and expenses of defending any suit against the Insured are included in determining when the applicable limits of insurance have been reached.

## 5. Records and Reports

The Insured agrees to maintain accurate records pertaining to coverages under this insurance program and to report to this Company as specified in the Declarations or applicable Coverage Sections. Such records shall be open to inspection by this Company or their representatives at all times during normal business hours during the currency of this policy and for three (3) years following expiration or until final settlement of all claims, whichever is later.

## 6. Inspections and Surveys

This Company has the right but is not obligated to:

6.1    Make inspections and surveys at any time;

6.2    Give you reports on the conditions found; and

6.3    Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. This Company does not make safety inspections nor undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public.

And this Company does not warrant that conditions:

6.4    Are safe or healthful; or

6.5    Give you reports on the conditions found; and

This condition applies not only to this Company, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## 7.    Concealment, Misrepresentation or Fraud

This insurance Program shall be void as to all interests insured if, whether before or after a loss, any insured hereunder has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interests of the insured therein, or in the case of any fraud or false swearing by any insured hereunder relating thereto.

## 8. Notice of Loss

The Insured shall as soon as practicable report in writing to the Company or its agent every loss, damage or occurrence which may give rise to a claim under this policy and shall also file with the Company or its agent within ninety (90) days from date of discovery of such loss, damage or occurrence, a detailed sworn

to all the Insured's rights of recovery thereof against any person or entity, and the Insured shall do whatever necessary to secure such rights.

## 12. Impairment of Recovery Rights

If any act or agreement of the Insured, before or after a loss arises, impairs the Insured's right to recover from others, the Company will not cover the loss or damage; nor will the Company cover any loss or damage which the Insured settles or compromises without the written consent of the Company.

## 13. Cancellation

Either the Insured or the Company can cancel this policy at any time.

### 13.1 Cancellation By The Insured

The Insured can cancel this insurance by sending the Company notice of the future date the Insured wants the coverage to end. The Company will then refund any unearned portion of the premium you paid, on a short rate basis.

### 13.2 Cancellation by the Company

The Company can cancel the insurance, or any Individual Coverage Section, by sending to the Insured first named in the Declarations, at the address shown on the Declarations, notice of the effective date of cancellation. The Company must do this at least 30 days prior to the cancellation date unless the Company is canceling the insurance because the Insured failed to pay premiums. In that case, the Company is required to give the Insured only 10 days notice. Mailing or delivery of the notice will be proof that the Insured was informed of the cancellation. The Company will also notify any mortgagee shown in the Declarations.

proof of loss. If claim is made or suit is brought against the Insured, the Insured shall immediately notify the Company and forward to the Company every demand, notice, summons or other legal process.

## 9. Protection of Property and Co-operation of the Insured

In case of loss it shall be necessary and lawful for the Insured, his or their factors, employees and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the property insured hereunder, or any part thereof, without prejudice to this insurance, nor shall the act as its of the Insured or Company, in recovery, saving and preserving the property insured in case of loss be considered a waiver or acceptance of abandonment. The expenses so incurred shall be borne by the Insured and the Company proportionately to the extent of their respective interests.

The Insured shall cooperate with the Company and upon the Company's request shall aid in securing information, evidence, obtaining of witnesses and in all other matters which the Company may deem necessary in respect to any occurrence as hereunder provided.

## 10. Payment of Losses

All adjusted claims shall be paid or made good to the Insured within sixty (60) days after presentation and acceptance of satisfactory proof of interest and loss at the office of this Company. No loss shall be paid or made good if the Insured has collected the same from others.

## 11. Subrogation

In the event of any payment under this policy the Company shall be subrogated

13.3 Additional premium may be due and owing to this Company upon cancellation for those Coverage Sections underwritten on a reporting basis, since reports are to be rendered to the date of cancellation.

## 14. Conformity to Statutes

Terms of this insurance which are in conflict with the statutes of the State wherein this insurance is issued are hereby amended to conform to the minimum requirements of such statutes.

## 15. Transfer of Legal Rights

The Insured may not agree to transfer any legal rights or interest the Insured has in this policy without the prior written consent of the Company.

However, if the Insured is an individual and the Insured dies, the Company will provide the following coverage:

15.1 The Insured's legal representative, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

15.2 Any person who has proper temporary legal custody of the Insured's property, but only with respect to liability arising out of the maintenance or use of that property and until a qualified legal representative is appointed.

## 16. No Benefit to Bailee

No person or organization, other than the Insured, having custody of Covered Property, will benefit from this insurance.

## 17. Other Insurance

17.1 The Insured may have other insurance subject to the same plan,

terms, conditions and provisions as the insurance under any of the Coverage Sections of this Program. If so, the Company will pay its share of the covered loss or damage. That share is the proportion that the applicable Limit of Insurance under the pertinent Coverage Section bears to the Limits of Insurance of all insurance covering on the same basis.

17.2 If there is other insurance covering the same loss or damage, other than that described in 17.1 above, the Company will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the Insured can collect on it or not. But the Company will not pay more than the applicable Limit of Insurance.

## 18. Changes

This policy contains all the agreements between the Insured and the Company concerning the insurance afforded. The Insured first named in the Declarations is authorized to make changes in the terms of this Program with the consent of the Company. This policy's terms can be amended or waived only by endorsement issued by the Company and made part of this insurance Program.

## 19. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

19.1 The Company will not pay the full amount of any loss if the value of the insured property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, the Company will determine the most the Company will pay using the following steps:

19.1.1 Multiply the value of the insured property at the time of loss by the coinsurance percentage;

19.1.2 Divide the Limit of Insurance of the property by the figure determined in step 19.1.1;

19.1.3 Multiply the total amount of loss, before the application of any deductible, by the figure determined in step 19.1.2; and

19.1.4 Subtract the deductible from the figure determined in step 19.1.3.

The Company will pay the amount determined in step 19.1.4 or the Limit of Insurance, whichever is less. For the remainder, the Insured will either have to rely on other insurance or absorb the loss itself.

19.2 If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

## 20. Time for Suit

20.1 No action shall lie against the Company for the recovery or any liability loss sustained by the Insured unless such action be brought against the Company within one (1) year after the final judgment or decree is entered in the litigation against the Insured, or in case the claim against the Company accrues without the entry of such final judgment or decree, unless such action be brought within one (1) year from the date of the payment of such action.

20.2 No action shall lie against the Company for the recovery of any claim for loss or damage to the Insured's own property (or other property insured on a first-party basis) unless commenced within one (1) year after the calendar date of the happening of the physical loss or damage out of which the claim is said to have arisen.

20.3 Provided however, that where the limitations of time provided for in 20.1 and 20.2 are prohibited by the State wherein this insurance is issued, then and in that event no action under this insurance shall be sustainable unless commenced within the shortest limitation permitted under the laws of such State.

## 21. Mortgagee and Trustee Interest

21.1 If there is loss to any real property covered under any Coverage Section, the Company will pay any mortgagee or trustee named in the Declarations up to his, her or its interest in that property. This provision will apply to all present or future mortgages in the order of precedence of these mortgages.

Regarding the interest of any mortgagee or trustee designated in the Declarations, this insurance will not be invalidated by any of the following:

21.1.1 Any act or neglect by any mortgagor or owner of the property;

21.1.2 Foreclosure or other proceedings, or notice of sale relating to the property;

21.1.3 Change in title or ownership of the property; or

21.1.4 Occupation of the premises for the purposes more hazardous than existed when this insurance took effect.

The mortgagee or trustee must notify the Company of any change of ownership or occupancy, or of any increase in hazard which he, she or it learns about. If required, by the Company, the insurance program will be amended to reflect this change. If the Insured fails to pay any premium due because of an increase in hazard, the mortgagee or trustee must pay this premium.

And if the Insured fails to pay any premium due under this policy, the Company has a right to collect the premium from the mortgagee or trustee.

## 21.2 Mortgagee Interest After a Loss

If the Company pays any loss under this insurance program to a mortgagee, and the Company claims it didn't have a legal duty to make payment to the mortgagor or owner, the Company can take over all the rights of the mortgagee, to the extent of our payment. These rights apply to all the securities that were pledged to secure the mortgage loan.

If the Company declines to do that, the Company is allowed to pay the mortgagee the rest of the principal and the interest on the mortgage. Then the Company get a full assignment and transfer of the mortgage right away. That means the Company has all the rights the mortgagee had originally. However, an assignment will not impair the right of the mortgagee to recover the full amount of its claim.

## 22. Captions, Titles Clause

Captions, titles and indexes used in this insurance Program are used for ease of reference only, and are not to be used to interpret the terms, conditions, exclusions or limitations of the insurance provided under the program.

## 23. Reporting and Adjustment

Insurance provided under Sections I and III of this policy are subject to the deposit shown in Declarations, and to an annual adjustment of the earned premium at the rates indicated.

The Insured shall report to the Company, or its Agent, within 30 days following the expiry of this insurance, an accurate statement of:

23.1 Total "receipts", excluding revenues from the sale of boats, supplies, ship stores, or brokerage commission;

23.2 Total "sales";

23.3 Total sales value of boats sold on a brokerage basis.

The earned premium shall be calculated by applying the figures reported above to the rates indicated in the Declarations. If the earned premium is less than the deposit premium, and the coverage section is not subject to a minimum premium, the difference shall be refunded to the Insured. If the earned premium exceeds the deposit premium, the amount of such excess shall be paid by the Insured to the Company as an additional premium at the time of filing the report on which the earned premium is due.

"Receipts" means income from dock/slip rental, mooring rental, storage, hauling/launching, fueling, repairs including parts and labor, regatta fees, sailing schools, yacht club membership dues, boat rental, camping fees, cabin rental, gate fees, sub-contractor receipts, tenant rents and all other miscellaneous income.

"Sales" means income from sale of new and/or used boats and accessories, ship store sales, boat broker commissions, restaurant/convenience store/snack bar/liquor sales.

CG 00 01   10 01

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II — Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V — Definitions.

## SECTION I — COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments — Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II — Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole

or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

   This insurance does not apply to:

   a. **Expected Or Intended Injury**

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   b. **Contractual Liability**

      "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agreement; or

Form No: CG 00 01
10 01
Page 2 of 13

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

   (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

   (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

   (a) Employment by the insured; or

   (b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

f. **Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

   (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

     (i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

     (ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

     (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

   (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

   (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

     (i) Any insured; or

     (ii) Any person or organization for whom you may be legally responsible; or

   (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site

or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. Mobile Equipment

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i.  War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j.  Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of these premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III — Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a side-track agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k.  Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.  Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.  Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.  Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.  Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III — Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

1.  **Insuring Agreement**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit"

seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance ; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments — Coverages A and B.

b.  This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2.  **Exclusions**

This insurance does not apply to:

a.  **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b.  **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

c.  **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d.  **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e.  **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f.  **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to

use another's advertising idea in your "advertisement".

g.  **Quality Or Performance Of Goods — Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h.  **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

i.  **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j.  **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of websites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k.  **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l.  **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m. **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n. **Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

## COVERAGE C MEDICAL PAYMENTS

1. **Insuring Agreement**

    a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

    (1) On premises you own or rent;

    (2) On ways next to premises you own or rent; or

    (3) Because of your operations;

    provided that:

    (1) The accident takes place in the "coverage territory" and during the policy period;

    (2) The expenses are incurred and reported to us within one year of the date of the accident; and

    (3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

    b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

    (1) First aid administered at the time of an accident;

    (2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

    (3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

    We will not pay expenses for "bodily injury":

    a. **Any Insured**

    To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while taking part in athletics.

f. **Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

Excluded under Coverage A.

h. **War**

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS — COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

    a. All expenses we incur.

    b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

    c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

    d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

    e. All costs taxed against the insured in the "suit".

    f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

    g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   b. This insurance applies to such liability assumed by the insured;

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   f. The indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with us in the investigation, settlement or defense of the "suit";

         (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         (c) Notify any other insurer whose coverage is available to the indemnitee; and

         (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      (2) Provides us with written authorization to:

         (a) Obtain records and other information related to the "suit"; and

         (b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I — Coverage A — Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II — WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      (1) "Bodily injury" or "personal and advertising injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while per-

forming duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III — LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. Damages under Coverage A; and

b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV — COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance**

   If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

   a. **Primary Insurance**

      This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

   b. **Excess Insurance**

      This insurance is excess over:

      (1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

         (a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

         (b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

         (c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I — Coverage A — Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is

greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V — DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including

any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

    a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

    b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

    c. All other parts of the world if the injury or damage arises out of:

        (1) Goods or products made or sold by you in the territory described in a. above;

        (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

        (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

    provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

    a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    b. You have failed to fulfill the terms of a contract or agreement;

    if such property can be restored to use by:

    a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

    b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

    a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

    b. A sidetrack agreement;

    c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

    d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    e. An elevator maintenance agreement;

    f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

    Paragraph f. does not include that part of any contract or agreement:

        (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

        (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

            (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

            (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

        (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, water-craft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

Form No: CG 00 01
10 01
Page 13 of 13

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on

leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

CL 564
(9-89)

**THIS ENDORSEMENT CHANGED THE POLICY. PLEASE READ IT CAREFULLY.**

CG 21 50 09 89

# AMENDMENT OF LIQUOR LIABILITY EXCLUSION

This endorsement modified insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

Exclusion c. of COVERAGE A (Section I) is replaced by the following:

c. "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you:

(1) Manufacture, sell or distribute alcoholic beverages;

(2) Serve or furnish alcoholic beverage for a charge whether or not such activity:

(a) Requires a license;

(b) Is for the purpose of financial gain or livelihood; or

(3) Serve or furnish alcoholic beverages without a charge, if a licence is required for such activity.

CG 04 31    09 98

# YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS — LIMITED COVERAGE OPTIONS

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULES

| SCHEDULE A — COVERAGES TO BE PROVIDED (SUBJECT TO THE DESCRIPTION IN SCHEDULE B) |
| --- |
| Check any one or more of the following: |
| ☒ Bodily Injury    ☐ Property Damage    ☐ Personal and Advertising Injury |
| SCHEDULE B — DESCRIPTION OF LOCATION, OPERATIONS, PRODUCTS OR SERVICES TO BE COVERED (TO WHICH SCHEDULE A APPLIES) |
| Description of location(s) operation(s), product(s) or service(s) |
| All locations, operations, products or services to which this policy applies: |
| SCHEDULE C — PREMIUM |
| Premium $      WAIVED |

The following exclusion is added to Paragraph 2., Exclusions of Section I — Coverage A — Bodily Injury And Property Damage Liability and Paragraph 2., Exclusions of Section I — Coverage B — Personal And Advertising Injury Liability:

**2.    Exclusions**

This insurance does not apply to "bodily injury", "property damage" or "personal injury" and "advertising injury" (or "personal and advertising injury" if defined as such in your policy) arising directly or indirectly out of:

a.    Any actual or alleged failure, malfunction or inadequacy of:

(1)    Any of the following, whether belonging to any insured or to others:

(a)    Computer hardware, including microprocessors;

(b)    Computer application software;

(c)    Computer operating systems and related software;

(d)    Computer networks;

(e)    Microprocessors (computer chips) not part of any computer system; or

(f)    Any other computerized or electronic equipment or components; or

(2)    Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph 2.a.(1) of this endorsement

due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

b.    Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph 2.a. of this endorsement.

This exclusion does not apply to the types of injury or damage indicated in Schedule A — Coverages To Be Provided of this endorsement arising out of any operations, products or services, or any operations or services at or from any specific location, described in Schedule B — Description Of Location, Operations, Products Or Services To Be Covered of this endorsement.

COMMERCIAL GENERAL LIABILITY
CG 21 67 04 02

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:

   **2. Exclusions**

   This insurance does not apply to:

   **Fungi or Bacteria**

   a. "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

   b. Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

   This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

B. The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

   **2. Exclusions**

   This insurance does not apply to:

   **Fungi or Bacteria**

   a. "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

   b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

C. The following definition is added to the **Definitions** Section:

   "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

**THIS ENDORSEMENT CHANGED THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modified insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

### SCHEDULE

1.  **Designation of Premises (Part Leased to You):**    39 Alexander Rd., Portsmith, RI

Name of Person or Organization (Additional Insured):    Newport Dinner Train & State of Rhode Island
56 Bridge St.
Newport, RI 02840

E.Y.S. Properties, LLC
C/O Advanced Communications
729 Boylston St., Suite 2
Boston, MA 02116

2.  Additional Premium:  nil

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1.  Any "occurrence" which takes Place after you cease to be a Tenant in that premises.

2.  Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the schedule.

CG 20 11 11 85          Copyright. Insurance Service Office, Inc., 1984

**THIS ENDORSEMENT CHANGED THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modified insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

## SCHEDULE

1. **Designation of Premises (Part Leased to You):**    349 Lincoln St., Hingham, MA

2. Name of Person or Organization (Additional Insured):    Hingham Shipyard, LLC
   349 Lincoln St.
   Hingham, MA 02043

3. Additional Premium: nil

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:
1. Any "occurrence" which takes Place after you cease to be a Tenant in that premises.

2. Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the schedule.

CG 20 11 11 85          Copyright. Insurance Service Office, Inc., 1984